[No. 30367. Department Two. January 2, 1948.]

THE STATE OF WASHINGTON, *on the Relation of Thomas W. Fong et al., Plaintiff,* v. THE SUPERIOR COURT FOR KING COUNTY, *J. T. Ronald, Judge, Respondent.*[1]

*John J. Kennett,* for relators.

*Lloyd Shorett* and *James D. McCutcheon, Jr.,* for respondent.

ROBINSON, J.—Relators, Thomas W. Fong, James Lee Hing, and Joseph Bauer, were named as defendants in a criminal action now pending in King county, Washington, and were charged therein with the crime of burglary in the second degree, alleged to have been committed on May 22, 1947.

On July 17, 1947, relators, two of whom had theretofore entered pleas of not guilty, filed in that action their petition

[1] Reported in 188 P. (2d) 125.

for the return to them of certain personal property alleged to have been wrongfully and unlawfully seized and taken from them at the time of their arrest by city police officers. Simultaneously with the filing of their petition, they also filed a motion to suppress from introduction as evidence upon the trial of the pending criminal action all of the articles and personal property described in their petition.

In due time, the petition and motion were presented to, and heard by, the superior court for King county, the Honorable J. T. Ronald, respondent herein, presiding. At that hearing, the relators and the state of Washington, the latter appearing through the prosecuting attorney for King county, respectively introduced certain affidavits bearing upon the matter. The state also introduced the testimony of the arresting officers. The relators did not appear in person, nor was any evidence offered in their behalf other than the affidavits.

At the conclusion of the hearing, the respondent, judge, entered an order denying relators' petition and also their motion. Relators thereupon filed in this court their petition for the issuance of an alternative writ of review directing the respondent, judge, to show cause why he should not be required to certify to this court the record of the afore-mentioned proceeding. On the same day, there was filed in this court a statement of facts signed by the respondent, judge, and certified by him to contain all of the matters and proceedings occurring in the cause heard by him. Respondent in due time also filed his answer and return to relators' petition for writ of review. The matter was subsequently argued in this court and is now before us for disposition on the record. The facts, as the respondent, judge, was entitled to find them from the evidence appearing as part of the statement of facts, may be summarized as follows:

Sometime after midnight of January 20, 1947, a robbery and burglary occurred at the headquarters of the Hop Sing Tong in Seattle. Two safes were broken open, one by the "drill and punch" method, and the other by ripping off the door of the safe. A large amount of money was taken.

In the early morning of January 21st, Detective M. C. Griffin and two uniformed policemen visited the premises and conducted an investigation. From persons present during the commission of the crime, it was learned that three men had participated in the affair, two of whom had spoken to each other in the Chinese language; the third participant was not heard to speak. The victims of the felony furnished a description of one of the robbers in particular, giving his approximate age and height, his build, complexion, and race, and calling attention to his peculiar Chinese dialect and precision of speech. After thorough examination of the scene and careful scrutiny of the methods by which the safes had been burglarized, Detective Griffin concluded that one of the three robbers and burglars was a white man who was the "mechanic on the job" of safecracking.

During the course of the investigation on that day, and at later times, Officer Griffin submitted the personal description which he had received to various members of the tong, and was told by three different individuals that the description fitted Thomas W. Fong, one of the relators herein. The officer also ascertained from one of his informants that Fong had the reputation of being capable of performing that kind of "job" and had been implicated in many of the same character up and down the Pacific coast.

During the succeeding months, Griffin continued his investigation and frequently obtained additional bits of information on the subject, but was unable to locate Fong.

In February or March of 1947, Detective Roy J. Mahoney joined in the investigation and received information from various sources to the effect that Fong was one of the three guilty parties. Mahoney was also advised by Captain George Lohrer of the sheriff's office that he had information connecting Fong with the crime.

On May 22, 1947, at about two o'clock in the afternoon, Detective Griffin received a telephone call in which he was told that two Chinamen and a white man were registered at cabin No. 2 of the Star Motel, which is situated at Fourth avenue south and Bennett street, in Seattle; he was further informed that these persons were in possession of a set of

burglary tools of the punch and rip type, and he also was given the license numbers of three automobiles used by the parties.

About eight o'clock that evening, Griffin and Mahoney drove to the Star Motel and, through Mrs. C. W. Pollard, owner and manager of the premises, confirmed the information that had been telephoned in that afternoon. Mrs. Pollard had seen the burglary tools while servicing the cabin in the absence of the tenants, sometime after their arrival at about eleven o'clock that morning.

At the time the detectives made their visit, the cabin was dark, and none of the three automobiles was in the vicinity. The officers consulted the register in the motel and found the names Dick Young and James Young, as being the persons occupying cabin No. 2. Mrs. Pollard informed the detectives that both of these men were Chinamen, and that the third man, who had not signed the register, was a white man. Mrs. Pollard had some question in her mind at that time as to whether the parties had then permanently vacated the cabin or whether they would be back later. She therefore asked the detectives to accompany her to the cabin to ascertain the situation. This they did. Entering the cabin after Mrs. Pollard had opened the door with her pass key, the detectives observed only a lot of paper strewn about the floor and an old gray overcoat thrown over a chair in one corner of the room. No tools, no luggage, and no other clothing of any kind were seen. Judging from appearances, the cabin had been permanently vacated.

The detectives then went back with Mrs. Pollard to her office and had some further conversation with her. After requesting her to inform them if anyone should later appear at the cabin, they left the premises. Toward midnight, the detectives returned and, after secreting their car, watched cabin No. 2 until four o'clock the next morning. No one, however, either entered or left the cabin during that time.

On the following day, May 23, 1947, Detective Griffin, by checking the license numbers of the cars, learned that relators Fong and Hing were the persons registered at the cabin under the name of Young.

At about eight o'clock that evening, Griffin and Mahoney returned to the Star Motel and again talked to Mrs. Pollard. Cabin No. 2 was dark at the time, and no automobile was near it. About eight thirty p. m., however, while the detectives were still talking to Mrs. Pollard, a car containing a Chinaman and a white man drove up and stopped near the office door. Mrs. Pollard said: "This is one of them." It proved to be the relators Hing and Bauer. The driver of the car, Bauer, remained outside while Hing came into the office to make a telephone call. About that same time, Detective Mahoney sauntered from the office, while Griffin remained inside. Being unable to complete his call, Hing left the office within a few minutes. Griffin followed. As Hing started across the street from the office toward cabin No. 2, Griffin accosted him, saying: "What are you doing way out here?" Hing replied:

"Oh, we are in cabin here. We are in the camp. We have a cabin over here. We have cabin camp. Yes, I register here. Yes, have funny name. We go under name James Young. I try to make a telephone call to get some Chinese girls. We are going to have a party out here tonight."

This conversation took place about fifteen or twenty feet from the corner of cabin No. 2. Mahoney was standing alongside Griffin while the latter was talking to Hing. Griffin thereupon put Hing under arrest. At that same moment, the officers observed a movement over at cabin No. 2. The door opened, and, from the doorway, the relator Bauer peered out. At sight of the officers, he turned and ran through the cabin into the lavatory in the rear. As he ran, he was seen to pick up something in the room and carry it with him. Griffin then commanded Hing to proceed forward into the cabin, while Mahoney raced past them both, pursuing Bauer into the lavatory. When overtaken, Bauer was in the act of pushing something down into the water bowl of the toilet with one hand and flushing the toilet with the other. Mahoney thrust his hand into the water bowl and retrieved a package containing two guns. Mahoney thereupon placed Bauer under arrest. Hing and Bauer were then handcuffed together and were questioned

by the detective; at the same time, a search of the cabin was begun.

Shortly thereafter, Fong appeared, rapped at the door of the cabin, was admitted, and immediately was put under arrest. Following this, the search of the cabin was completed. It is conceded that the officers seized, and still have in custody the following articles: a brown coat and pants, a pair of brown oxfords, a briefcase and contents, a letter from Muriel Lee Hing, a keyring and bunch of keys, two metal pipe cleaners, designated by the police officers as hypo needles, one shaving outfit, and two guns. A personal search of Fong at the time revealed a roll of one hundred dollar bills in one of his pockets. It is further conceded that, after relators were arrested and taken to police headquarters, they were searched, and that sums of money aggregating $4,280 in currency were found upon their persons. This money is still held by the police department in its safe.

During the time of the arrest and search at the cabin, Hing and Fong endeavored to bribe the officers by offering them the money found upon their persons.

It should be understood that the officers arrested these relators on May 23, 1947, upon the belief that they had committed the robbery and burglary perpetrated on *January 21, 1947,* not on the ground or belief that they had committed the crime of second-degree burglary effected *May 22, 1947,* with which alone they presently stand charged; the fact is that, at the time of the arrest, the officers knew nothing about the burglary which had been committed the night before.

Relators' present contentions are predicated fundamentally upon (1) the fourth amendment to the constitution of the United States, which guarantees the right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures, and Art. I, § 7, of the Washington constitution, which provides that no person shall be disturbed in his private affairs, or his home invaded, without authority of law; and (2) the well-recognized rule, as laid down by the authorities, that, where the

illegality of a search and seizure has been established, the seized articles should be suppressed from admission in evidence and returned to the owner thereof. See *Boyd v. United States,* 116 U. S. 616, 29 L. Ed. 746, 6 S. Ct. 524; *Weeks v. United States,* 232 U. S. 383, 58 L. Ed. 652, 34 S. Ct. 341, Ann. Cas. 1915C, 1177, L. R. A. 1915B, 834; *State v. Gibbons,* 118 Wash. 171, 203 Pac. 390; *State v. Kinnear,* 162 Wash. 214, 298 Pac. 449, 74 A. L. R. 1400; *State v. Bantam,* 163 Wash. 598, 1 P. (2d) 861; *State v. Innocenti,* 170 Wash. 286, 16 P. (2d) 439; *State v. Thomas,* 183 Wash. 643, 49 P. (2d) 28; *State v. Gunkel,* 188 Wash. 528, 63 P. (2d) 376; *State v. Lindsey,* 192 Wash. 356, 73 P. (2d) 738, certiorari denied, *Lindsey v. Washington,* 303 U. S. 654, 82 L. Ed. 1114, 58 S. Ct. 761, rehearing denied, 303 U. S. 669, 82 L. Ed. 1125, 58 S. Ct. 830; *Tacoma v. Houston,* 27 Wn. (2d) 215, 177 P. (2d) 886; *In re Behrens,* 39 F. (2d) 561; 47 Am. Jur. 529, Searches and Seizures, § 48.

Respondent does not dispute the binding and controlling effect of either the constitutional mandates or the rule of decision.

The crucial question here is whether the evidence in this case establishes that the arrest of the relators, the search of their persons and premises, and the seizure of the property were unlawful. Relators contend that all those acts were without authority of law, because, at the time of the arrests and search, the arresting officers did not have probable cause for believing that the relators were guilty of the crime of robbery and burglary committed on January 21, 1947. The argument is that, with respect to the question of relators' guilt, the officers possessed no knowledge based upon personal observation, but only such as they had gained through hearsay, and that such evidence would not have been competent in a trial by jury.

The officers knew, of course, that the crime had been committed, and they believed that the relators were the guilty parties. They so testified. The issue, then, is whether or not, from the information and knowledge which the officers had and from the observations which they personally made, they had reasonable grounds for their belief.

■ It is the rule in this state, in felony cases, that if an officer believes, and has good reason to believe, that a person has committed a felony, he may arrest such person without a warrant. *State v. Hughlett,* 124 Wash. 366, 214 Pac. 841; *State v. Zupan,* 155 Wash. 80, 283 Pac. 671; *State v. Krantz,* 24 Wn. (2d) 350, 164 P. (2d) 453. In the *Hughlett* case, *supra,* the court very clearly states the rule, explains and limits its application, and defines the grounds for reasonable belief of the guilt of the person arrested, as follows:

"In misdemeanor cases the officer may not arrest without a warrant therefor, except where the crime is being committed in his presence, or where he had actual knowledge that the person about to be arrested committed the crime. But in cases amounting to a felony, if the officer believe, and have good reason to believe, that a person has committed, or is about to commit, or is in the act of committing the crime, then he may arrest without a warrant. But the arresting officer must not only have a real belief of the guilt of the person about to be arrested, but such belief must be based upon reasonable grounds. Proper cause for arrest has often been defined to be a reasonable ground of suspicion, supported by circumstances sufficiently strong in themselves to warrant a cautious man in believing the accused to be guilty. An officer may not arrest simply because he has some fleeting idea that one may be about to commit a felony, but he must have a reasonable ground for his belief."

The foregoing quotation expresses the rule as it obtains elsewhere generally. 4 Am Jur. 18, 19, Arrest, §§ 25, 26; 6 C. J. S. 586, 589, Arrest, § 6.

■ Without repeating or further summarizing the evidence set forth at length above, we are satisfied that the arresting officer not only honestly believed, but also had reasonable grounds for believing, that the relators were guilty of the crime committed on January 21, 1947. The respondent, judge, analyzing the evidence and determining therefrom the right and duty of the arresting officers, said: "As it is, they did what incorruptible and competent officers should do, they arrested these men." We agree with that conclusion.

■ Since the arrests were lawful, the officers had the right, as incident to the arrests, to search the cabin where the arrests were made, even though the cabin be considered to have been the relators' residence for the time being. *State v. Evans,* 145 Wash. 4, 258 Pac. 845; *State v. Much,* 156 Wash. 403, 287 Pac. 57; *State v. Thomas,* 183 Wash. 643, 49 P. (2d) 28; *State v. Lindsey, supra.*

■ As has been pointed out above, the arrests were made as for the crime committed on January 21, 1947, whereas the crime with which relators presently stand charged was committed on May 22, 1947, the very day they took occupancy of cabin No. 2, which was the day preceding their arrest. Although relators make mention of these facts, they do not rely thereon for a reversal of the court's order. In any event, the mere fact that relators are now charged with the commission of a crime other than the one for which they were arrested does not invalidate the arrest or the search incidental thereto, nor does it of itself render the property seized incapable of being admitted as evidence upon prosecution for the crime charged, if such evidence be otherwise competent. Property seized either under a valid search warrant or as incident to a lawful arrest may be used in the prosecution of a suspected person for a crime other than the one for which he was arrested or for which a search warrant was issued. See *State v. McKindel,* 148 Wash. 237, 268 Pac. 593; *State v. Deitz,* 136 Wash. 228, 239 Pac. 386; *Gouled v. United States,* 255 U. S. 298, 65 L. Ed. 647, 41 S. Ct. 261; *Harris v. United States,* 331 U. S. 145, 91 L. Ed. 1399, 67 S. Ct. 1098.

Relators make some contention in their brief that the articles which were seized have no evidentiary value either as to the means of committing the crime charged or as to the fruits thereof. The record before us does not show that this point was urged before the respondent judge. Furthermore, the record does not disclose, nor in any way indicate, what the state will attempt to prove at the trial of the criminal charge or what evidence will be admissible and what will not. It may, or may not, be true that some of the

articles will have no evidentiary value upon any issue involved in the pending criminal action. However, that matter can best be determined upon the trial of the case when and if the articles are offered in evidence.

Relators appear to be particularly interested in the money, guns, and clothing that were seized by the officers. Each and all of these particular articles may well have evidentiary value with reference to the crime with which relators are now charged. We will not presume that such articles have no evidentiary value in the instant case.

The order made by the respondent, judge, will be affirmed, and relators' petition in this court will be denied.

MALLERY, C. J., BEALS, STEINERT, and JEFFERS, JJ., concur.

March 8, 1948. Petition for rehearing denied.