# UNITED STATES *v.* RABINOWITZ.

No. 293.   Argued January 11, 1950.—Decided February 20, 1950.

*Solicitor General Perlman* argued the cause for the United States. With him on the brief were *Assistant Attorney General Campbell, Robert S. Erdahl* and *Harold D. Cohen*.

*Abraham Lillienthal* argued the cause and filed a brief for respondent.

MR. JUSTICE MINTON delivered the opinion of the Court.

Respondent was convicted of selling and of possessing and concealing forged and altered obligations of the United States with intent to defraud. The question presented here is the reasonableness of a search without a search warrant of a place of business consisting of a one-room office, incident to a valid arrest.

On February 1, 1943, a printer who possessed plates for forging "overprints" on canceled stamps was taken into custody. He disclosed that respondent, a dealer in stamps, was one of the customers to whom he had delivered large numbers of stamps bearing forged overprints.[1] On Saturday, February 6, 1943, with this information concerning respondent and his activities in the hands of Government officers, a postal employee was sent to respondent's place of business to buy stamps bearing overprints. He bought four stamps. On Monday, February 8, the stamps were sent to an expert to determine whether the overprints were genuine. On February 9 the report was received showing the overprints to be forgeries, having been placed upon the stamps after cancellation, and not before as was the Government's practice. On February 11 a further statement was obtained

---

[1] The stamps involved were genuine postage stamps. At certain times the Government has printed the name of a particular state or possession on stamps prior to post office sale. Canceled stamps bearing these overprints have an unusual value for stamp collectors.

58

from the printer who had made the overprints. On February 16, 1943, a warrant for the arrest of respondent was obtained.

In 1941 respondent had been convicted and sentenced to three months' imprisonment on a plea of guilty to a two-count indictment charging the alteration of obligations of the United States, that is, of overprinting Government postage stamps, and the possession of a plate from which a similitude of a United States obligation had been printed. Thus, when the warrant for arrest was obtained, the officers had reliable information that respondent was an old offender, that he had sold four forged and altered stamps to an agent of the Government, and that he probably possessed several thousand altered stamps bearing forged overprints. While the warrant of arrest was not put in evidence it contained, as a Government witness testified on cross-examination, authority to arrest for more than the sale of the four stamps; it covered all the Government officers' information.[2]

Armed with this valid warrant for arrest, the Government officers, accompanied by two stamp experts, went to respondent's place of business, a one-room office open to the public. The officers thereupon arrested the re-

---

[2] "Q. Now, when you went to Mr. Rabinowitz's place of business, all you had with you was a warrant to arrest him in connection with the alleged sale of those four stamps; is that correct?

"A. And all information contained in the arrest warrant; yes.

"Q. I didn't hear the last part of your answer.

"A. In our questions a few minutes back, I stated that the four stamps were specifically mentioned in the application for the warrant for arrest, but that there was other information in my possession that was included in that warrant for arrest.

"Q. Well, wasn't the warrant of arrest issued solely on the charge that Mr. Rabinowitz had sold four stamps containing false or altered overprints? Wasn't that what the warrant of arrest was issued for?

"A. Primarily, yes, but not completely."

spondent, and over his objection searched the desk, safe, and file cabinets in the office for about an hour and a half. They found and seized 573 stamps, on which it was later determined that overprints had been forged, along with some other stamps which were subsequently returned to respondent.

Respondent was indicted on two counts. He was charged in count one with selling four forged and altered stamps, knowing they were forged and altered and with the intent that they be passed as genuine.[3] The second count charged that he did keep in his possession and conceal, with intent to defraud, the 573 forged and altered stamps.[4]

Respondent made timely motions for suppression and to strike the evidence pertaining to the 573 stamps, all of which were eventually denied. Respondent was convicted on both counts after trial before a jury in which he offered no evidence. Relying on *Trupiano* v. *United States,* 334 U. S. 699, the Court of Appeals, one judge dissenting, reversed on the ground that since the officers had had time in which to procure a search warrant and had failed to do so the search was illegal, and the evidence therefore should have been excluded. 176 F. 2d 732. We granted certiorari to determine the validity of the search because of the question's importance in the administration of the law of search and seizure. 338 U. S. 884.

Were the 573 stamps, the fruits of this search, admissible in evidence? If legally obtained, these stamps were competent evidence to show intent under the first count of the indictment, and they were the very things the possession of which was the crime charged in the second count.

---

[3] 18 U. S. C. (1946 ed.) § 268.

[4] 18 U. S. C. (1946 ed.) § 265. All of these stamps are defined by statute as obligations of the United States. 18 U. S. C. (1946 ed.) § 261.

60

The Fourth Amendment provides:

"The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

It is unreasonable searches that are prohibited by the Fourth Amendment. *Carroll* v. *United States,* 267 U. S. 132, 147. It was recognized by the framers of the Constitution that there were reasonable searches for which no warrant was required. The right of the "people to be secure in their persons" was certainly of as much concern to the framers of the Constitution as the property of the person. Yet no one questions the right, without a search warrant, to search the person after a valid arrest. The right to search the person incident to arrest always has been recognized in this country and in England. *Weeks* v. *United States,* 232 U. S. 383, 392. Where one had been placed in the custody of the law by valid action of officers, it was not unreasonable to search him.

Of course, a search without warrant incident to an arrest is dependent initially on a valid arrest. Here the officers had a warrant for respondent's arrest which was, as far as can be ascertained, broad enough to cover the crime of possession charged in the second count, and consequently respondent was properly arrested. Even if the warrant of arrest were not sufficient to authorize the arrest for possession of the stamps, the arrest therefor was valid because the officers had probable cause to believe that a felony was being committed in their very presence. *Carroll* v. *United States,* 267 U. S. 132, 156–57.

The arrest was therefore valid in any event, and respondent's person could be lawfully searched. Could the

officers search his desk, safe and file cabinets, all within plain sight of the parties, and all located under respondent's immediate control in his one-room office open to the public?

Decisions of this Court have often recognized that there is a permissible area of search beyond the person proper. Thus in *Agnello* v. *United States,* 269 U. S. 20, 30, this Court stated:

> "The right without a search warrant contemporaneously to search persons lawfully arrested while committing crime and to search the place where the arrest is made in order to find and seize things connected with the crime as its fruits or as the means by which it was committed, as well as weapons and other things to effect an escape from custody, is not to be doubted."

The right "to search the place where the arrest is made in order to find and seize things connected with the crime as its fruits or as the means by which it was committed" seems to have stemmed not only from the acknowledged authority to search the person, but also from the longstanding practice of searching for other proofs of guilt within the control of the accused found upon arrest. *Weeks* v. *United States,* 232 U. S. 383, 392. It became accepted that the premises where the arrest was made, which premises were under the control of the person arrested and where the crime was being committed, were subject to search without a search warrant. Such a search was not "unreasonable." *Agnello* v. *United States,* 269 U. S. 20, 30; *Carroll* v. *United States,* 267 U. S. 132, 158; *Boyd* v. *United States,* 116 U. S. 616, 623–24.

In *Marron* v. *United States,* 275 U. S. 192, the officers had a warrant to search for liquor, but the warrant did not describe a certain ledger and invoices pertaining to the operation of the business. The latter were seized during the search of the place of business but were not

returned on the search warrant as they were not described therein. The offense of maintaining a nuisance under the National Prohibition Act was being committed in the room by the arrested bartender in the officers' presence. The search warrant was held not to cover the articles seized, but the arrest for the offense being committed in the presence of the officers was held to authorize the search for and seizure of the ledger and invoices, this Court saying:

> "The officers were authorized to arrest for crime being committed in their presence, and they lawfully arrested Birdsall. They had a right without a warrant contemporaneously to search the place in order to find and seize the things used to carry on the criminal enterprise. . . . The closet in which liquor and the ledger were found was used as a part of the saloon. And, if the ledger was not as essential to the maintenance of the establishment as were bottles, liquors and glasses, it was none the less a part of the outfit or equipment actually used to commit the offense. And, while it was not on Birdsall's person at the time of his arrest, it was in his immediate possession and control. The authority of officers to search and seize the things by which the nuisance was being maintained, extended to all parts of the premises used for the unlawful purpose."
> *Marron* v. *United States,* 275 U. S. 192, 198–199.

We do not understand the *Marron* case to have been drained of contemporary vitality by *Go-Bart Co.* v. *United States,* 282 U. S. 344, and *United States* v. *Lefkowitz,* 285 U. S. 452. Those cases condemned general exploratory searches, which cannot be undertaken by officers with or without a warrant. In the instant case the search was not general or exploratory for whatever might be turned up. Specificity was the mark of the search and seizure here. There was probable cause to believe

that respondent was conducting his business illegally. The search was for stamps overprinted illegally, which were thought upon the most reliable information to be in the possession of and concealed by respondent in the very room where he was arrested, over which room he had immediate control and in which he had been selling such stamps unlawfully. *Harris* v. *United States,* 331 U. S. 145, which has not been overruled, is ample authority for the more limited search here considered. In all the years of our Nation's existence, with special attention to the Prohibition Era, it seems never to have been questioned seriously that a limited search such as here conducted as incident to a lawful arrest was a reasonable search and therefore valid.[5] It has been considered in the same pattern as search of the person after lawful arrest.

What is a reasonable search is not to be determined by any fixed formula. The Constitution does not define what are "unreasonable" searches and, regrettably, in our discipline we have no ready litmus-paper test. The recurring questions of the reasonableness of searches must find resolution in the facts and circumstances of each case. *Go-Bart Co.* v. *United States,* 282 U. S. 344, 357. Reasonableness is in the first instance for the District Court to determine. We think the District Court's conclusion

---

[5] When construing state safeguards similar to the Fourth Amendment of the Federal Constitution, state courts have shown little hesitancy in holding that incident to a lawful arrest upon premises within the control of the arrested person, a search of the premises at least to the extent conducted in the instant case is not unreasonable. See, *e. g.: Argetakis* v. *State,* 24 Ariz. 599, 212 P. 372; *Italiano* v. *State,* 141 Fla. 249, 193 So. 48; *State* v. *Conner,* 59 Idaho 695, 89 P. 2d 197; *State* v. *Carenza,* 357 Mo. 1172, 212 S. W. 2d 743; *State ex rel. Wong You* v. *District Court,* 106 Mont. 347, 78 P. 2d 353; *Davis* v. *State,* 30 Okla. Cr. 61, 234 P. 787; *State ex rel. Fong* v. *Superior Court,* 29 Wash. 2d 601, 188 P. 2d 125; *State* v. *Adams,* 103 W. Va. 77, 136 S. E. 703.

that here the search and seizure were reasonable should be sustained because: (1) the search and seizure were incident to a valid arrest; (2) the place of the search was a business room to which the public, including the officers, was invited; (3) the room was small and under the immediate and complete control of respondent; (4) the search did not extend beyond the room used for unlawful purposes; (5) the possession of the forged and altered stamps was a crime, just as it is a crime to possess burglars' tools, lottery tickets or counterfeit money.[6]

Assuming that the officers had time to procure a search warrant, were they bound to do so? We think not, because the search was otherwise reasonable, as previously concluded. In a recent opinion, *Trupiano* v. *United States,* 334 U. S. 699, this Court first enunciated the requirement that search warrants must be procured when "practicable" in a case of search incident to arrest. On the occasion of the previous suggestion of such a test, *Taylor* v. *United States,* 286 U. S. 1, the Court had been scrupulous to restrict the opinion to the familiar situation there presented. Prohibition agents, having received complaints for about a year, went at 2:30 a. m. to a garage adjacent to a house, flashed a light through a small opening, and then broke in and seized liquor. The Court emphasized that "No one was within the place and there was no reason to think otherwise." *Id.* at 5. Lest the holding that such a search of an unoccupied building

---

[6] There is no dispute that the objects searched for and seized here, having been utilized in perpetrating a crime for which arrest was made, were properly subject to seizure. Such objects are to be distinguished from merely evidentiary materials which may not be taken into custody. *United States* v. *Lefkowitz, supra,* at 464–66; *Gouled* v. *United States,* 255 U. S. 298, 309–11. This is a distinction of importance, for "limitations upon the fruit to be gathered tend to limit the quest itself . . . ." *United States* v. *Poller,* 43 F. 2d 911, 914.

was unreasonable be thought to have broader significance the Court carefully stated in conclusion: "This record does not make it necessary for us to discuss the rule in respect of searches in connection with an arrest. No offender was in the garage; the action of the agents had no immediate connection with an arrest. The purpose was to secure evidence to support some future arrest." *Id.* at 6.

A rule of thumb requiring that a search warrant always be procured whenever practicable may be appealing from the vantage point of easy administration. But we cannot agree that this requirement should be crystallized into a *sine qua non* to the reasonableness of a search. It is fallacious to judge events retrospectively and thus to determine, considering the time element alone, that there was time to procure a search warrant. Whether there was time may well be dependent upon considerations other than the ticking off of minutes or hours. The judgment of the officers as to when to close the trap on a criminal committing a crime in their presence or who they have reasonable cause to believe is committing a felony is not determined solely upon whether there was time to procure a search warrant. Some flexibility will be accorded law officers engaged in daily battle with criminals for whose restraint criminal laws are essential.

It is appropriate to note that the Constitution does not say that the right of the people to be secure in their persons should not be violated without a search warrant if it is practicable for the officers to procure one. The mandate of the Fourth Amendment is that the people shall be secure against *unreasonable* searches. It is not disputed that there may be reasonable searches, incident to an arrest, without a search warrant. Upon acceptance of this established rule that some authority to search follows from lawfully taking the person into custody, it becomes apparent that such searches turn upon the

reasonableness under all the circumstances and not upon the practicability of procuring a search warrant, for the warrant is not required. To the extent that *Trupiano* v. *United States,* 334 U. S. 699, requires a search warrant solely upon the basis of the practicability of procuring it rather than upon the reasonableness of the search after a lawful arrest, that case is overruled. The relevant test is not whether it is reasonable to procure a search warrant, but whether the search was reasonable. That criterion in turn depends upon the facts and circumstances— the total atmosphere of the case. It is a sufficient precaution that law officers must justify their conduct before courts which have always been, and must be, jealous of the individual's right of privacy within the broad sweep of the Fourth Amendment.

We do not treat additional questions raised by respondent in his brief to support the judgment of the Court of Appeals. We consider it appropriate to dispose of these issues on the basis of the excellent discussion below.

The motion to suppress the evidence was properly denied by the District Court. The judgment of the Court of Appeals is

*Reversed.*

Mr. Justice Douglas took no part in the consideration or decision of this case.

Mr. Justice Black, dissenting.

*Trupiano* v. *United States,* 334 U. S. 699, was decided on the unarticulated premise that the Fourth Amendment of itself barred the use of evidence obtained by what the Court considered an "unreasonable" search. I dissented in that case. Later, concurring in this Court's decision in *Wolf* v. *Colorado,* 338 U. S. 25, 39–40, I stated my agreement with the "plain implication" of the *Wolf* opinion that "the federal exclusionary rule is not a com-

mand of the Fourth Amendment but is a judicially created rule of evidence which Congress might negate." In the light of the *Wolf* case, the *Trupiano* rule is not a constitutional command, but rather an evidentiary policy adopted by this Court in the exercise of its supervisory powers over federal courts. *Cf. McNabb* v. *United States,* 318 U. S. 332. The present case comes within that rule: the trial court admitted certain evidence procured by a search and seizure without a search warrant although the officers had ample time and opportunity to get one. Whether this Court should adhere to the *Trupiano* principle making evidence so obtained inadmissible in federal courts now presents no more than a question of what is wise judicial policy. Although the rule does not in all respects conform to my own ideas, I think that the reasons for changing it are outweighed by reasons against its change.

In recent years, the scope of the rule has been a subject of almost constant judicial controversy both in trial and appellate courts. In no other field has the law's uncertainty been more clearly manifested. To some extent that uncertainty may be unavoidable. The *Trupiano* case itself added new confusions "in a field already replete with complexities." *Trupiano* v. *United States, supra,* 716. But overruling that decision merely aggravates existing uncertainty. For. as MR. JUSTICE FRANKFURTER points out, today's holding casts doubt on other cases recently decided. And I do not understand how trial judges can be expected to foresee what further shifts may occur. In my judgment it would be wiser judicial policy to adhere to the *Trupiano* rule of evidence, at least long enough to see how it works.

That rule is based upon very strict requirements designed to narrow the occasions upon which officers can make searches and seizures without judicial warrant. Unquestionably its application will now and then permit

a guilty person to escape conviction because of hasty or ill-advised action on the part of enforcement officers. But the same may be said of the requirements of the Fourth Amendment which the exclusionary rule was fashioned to implement. The framers of the Fourth Amendment must have concluded that reasonably strict search and seizure requirements were not too costly a price to pay for protection against the dangers incident to invasion of private premises and papers by officers, some of whom might be overzealous and oppressive. See dissent in *Feldman* v. *United States,* 322 U. S. 487, 500–502. Nor can I see where the enforcement of criminal justice is likely to be seriously handicapped by adhering to the *Trupiano* holding.

I would affirm the judgment of the Court of Appeals.

Mr. Justice Frankfurter, whom Mr. Justice Jackson joins, dissenting.

The clear-cut issue before us is this: in making a lawful arrest, may arresting officers search without a search warrant not merely the person under arrest or things under his immediate physical control, but the premises where the arrest is made, although there was ample time to secure such a warrant and no danger that the "papers and effects" for which a search warrant could be issued would be despoiled or destroyed?

The old saw that hard cases make bad law has its basis in experience. But petty cases are even more calculated to make bad law. The impact of a sordid little case is apt to obscure the implications of the generalization to which the case gives rise. Only thus can I account for a disregard of the history embedded in the Fourth Amendment and the great place which belongs to that Amendment in the body of our liberties as recognized and applied by unanimous decisions over a long stretch of the Court's history.

It is a fair summary of history to say that the safeguards of liberty have frequently been forged in controversies involving not very nice people. And so, while we are concerned here with a shabby defrauder, we must deal with his case in the context of what are really the great themes expressed by the Fourth Amendment. A disregard of the historic materials underlying the Amendment does not answer them.

1. It is true also of journeys in the law that the place you reach depends on the direction you are taking. And so, where one comes out on a case depends on where one goes in. It makes all the difference in the world whether one approaches the Fourth Amendment as the Court approached it in *Boyd* v. *United States,* 116 U. S. 616, in *Weeks* v. *United States,* 232 U. S. 383, in *Silverthorne Lumber Co.* v. *United States,* 251 U. S. 385, in *Gouled* v. *United States,* 255 U. S. 298, or one approaches it as a provision dealing with a formality. It makes all the difference in the world whether one recognizes the central fact about the Fourth Amendment, namely, that it was a safeguard against recurrence of abuses so deeply felt by the Colonies as to be one of the potent causes of the Revolution, or one thinks of it as merely a requirement for a piece of paper.

2. This is the Fourth Amendment:

> "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

These words are not just a literary composition. They are not to be read as they might be read by a man who knows English but has no knowledge of the history that gave rise to the words. The clue to the meaning and

scope of the Fourth Amendment is John Adams' characterization of Otis' argument against search by the police that "American independence was then and there born." 10 Adams, *Works* 247. One cannot wrench "unreasonable searches" from the text and context and historic content of the Fourth Amendment. It was the answer of the Revolutionary statesmen to the evils of searches without warrants and searches with warrants unrestricted in scope. Both were deemed "unreasonable." Words must be read with the gloss of the experience of those who framed them. Because the experience of the framers of the Bill of Rights was so vivid, they assumed that it would be carried down the stream of history and that their words would receive the significance of the experience to which they were addressed—a significance not to be found in the dictionary. When the Fourth Amendment outlawed "unreasonable searches" and then went on to define the very restricted authority that even a search warrant issued by a magistrate could give, the framers said with all the clarity of the gloss of history that a search is "unreasonable" unless a warrant authorizes it, barring only exceptions justified by absolute necessity. Even a warrant cannot authorize it except when it is issued "upon probable cause . . . and particularly describing the place to be searched, and the persons or things to be seized." [1] With all respect I suggest that it makes a mockery of the Fourth Amendment to sanction search without a search warrant merely because of the

---

[1] For a more detailed summary of the English and American history underlying the Fourth Amendment, see the dissenting opinions in *Davis* v. *United States,* 328 U. S. 582, 603–05, and *Harris* v. *United States,* 331 U. S. 145, 157–62. The impact of this history was such that every State of the Union now affords constitutional safeguards against governmental search and seizure. Its contemporary vitality is emphasized by New York's adoption of such a provision as recently as 1938. N. Y. Const. of 1938, Art. 1, § 12.

legality of an arrest. I have yet to hear the answer to Judge Learned Hand's reasoning below that to make the validity of a search

"depend upon the presence of the party in the premises searched at the time of the arrest . . . would make crucial a circumstance that has no rational relevance to the purposes of the privilege. The feelings which lie behind it have their basis in the resentment, inevitable in a free society, against the invasion of a man's privacy without some judicial sanction. It is true that when one has been arrested in his home or his office, his privacy has already been invaded; but that interest, though lost, is altogether separate from the interest in protecting his papers from indiscriminate rummage, even though both are customarily grouped together as parts of the 'right of privacy.' . . . The history of the two privileges is altogether different; the Fourth Amendment distinguishes between them; and in statutes they have always been treated as depending upon separate conditions." 176 F. 2d 732, 735.

3. This brings me to a consideration of the right of search and seizure "incident to arrest." Undue haste in coming to that issue too readily leads to getting off the track of the Fourth Amendment. The Government argued as though the Constitution said search of premises may be at large whenever an arrest is made in them. The utterly free hand, for all practical purposes, this gives the arresting officers to rummage all over the house is, I think, inevitable unless the basis of any right to search as an incident to arrest is put in proper focus. Photographs can be so taken as to make a midget look like a giant, and vice versa. The same kind of distortion results if a legal doctrine embedded in a larger matrix of principle is taken out of the matrix and elevated to an independent position. In

72

plain English, the right to search incident to arrest is merely one of those very narrow exceptions to the "guaranties and immunities which we had inherited from our English ancestors, and which had from time immemorial been subject to certain well-recognized exceptions arising from the necessities of the case." *Robertson* v. *Baldwin,* 165 U. S. 275, 281.

4. What, then, is the exception to the prohibition by the Fourth Amendment of search without a warrant in case of a legal arrest, whether the arrest is on a warrant or based on the historic right of arrest without a warrant if a crime is committed in the presence of the arrester? The exception may in part be a surviving incident of the historic role of "hue and cry" in early Anglo-Saxon law. See Judge Cardozo in *People* v. *Chiagles,* 237 N. Y. 193, 196, 142 N. E. 583, 584. Its basic roots, however, lie in necessity. What is the necessity? Why is search of the arrested person permitted? For two reasons: first, in order to protect the arresting officer and to deprive the prisoner of potential means of escape, *Closson* v. *Morrison,* 47 N. H. 482, and, secondly, to avoid destruction of evidence by the arrested person. See *Reifsnyder* v. *Lee,* 44 Iowa 101, 103; *Holker* v. *Hennessey,* 141 Mo. 527, 540, 42 S. W. 1090, 1093. From this it follows that officers may search and seize not only the things physically on the person arrested, but those within his immediate physical control. What a farce it makes of the whole Fourth Amendment to say that because for many legal purposes everything in a man's house is under his control therefore his house—his rooms—may be searched. Of course in this field of law, as in others, opinions sometimes use language not with fastidious precision. Apart from such instances of loose use of language, the doctrine of search incidental to arrest has, until very recently, been strictly confined to the necessities of the situation, *i. e.,* the search

of the person and those immediate physical surroundings which may fairly be deemed to be an extension of his person.

5. Another exception to the constitutional prohibition of unreasonable searches is likewise rooted in necessity. The search without a warrant of moving objects—vehicles and vessels—was sanctioned in *Carroll* v. *United States,* 267 U. S. 132, on the ground that "it is not practicable to secure a warrant because the vehicle can be quickly moved out of the locality or jurisdiction in which the warrant must be sought." 267 U. S. at 153. Furthermore, the limits of the exception were carefully defined in terms of necessity, for the Court added:

> "In cases where the securing of a warrant is reasonably practicable, it must be used, and when properly supported by affidavit and issued after judicial approval protects the seizing officer against a suit for damages. In cases where seizure is impossible except without warrant, the seizing officer acts unlawfully and at his peril unless he can show the court probable cause." 267 U. S. at 156.

Even as to moving vehicles, this Court did not lay down an absolute rule dispensing with a search warrant. It limited dispensation to the demands of necessity, where want of time precluded the obtaining of a warrant. The necessity founded on the time factor which guided the Court in the *Carroll* case cannot justify the search here made of the respondent's premises, for there was ample time to obtain a warrant before the arrest and even on the occasion of the arrest.

6. It is in this connection that the body of congressional enactments becomes significant, particularly legislation contemporaneous with the adoption of the Bill of Rights. If explicit legislation was deemed necessary to inspect without warrant even vessels and vehicles, and if

Congress has been very niggardly in giving authority to search even with a warrant—niggardly both as to the officers who may obtain such warrants and as to strictly defined circumstances under which search is allowed— the attitude disclosed by this impressive legislation bears powerfully on the historic purposes of the Fourth Amendment and the functions that it fulfills in our democracy. It deserves to be recalled that Congress, despite repeated requests by Attorneys General, long refused to make search by warrant generally available as an aid to criminal prosecution. It did not do so until the First World War and even then it did not do so except under conditions most carefully circumscribed.[2]

7. With only rare deviations, such as today's decision, this Court has construed the Fourth Amendment "liberally to safeguard the right of privacy." *United States* v. *Lefkowitz,* 285 U. S. 452, 464.[3] The guiding line in dealing with the Fourth Amendment was set forth in *Gouled* v. *United States,* 255 U. S. 298, 303–04:

> "It would not be possible to add to the emphasis with which the framers of our Constitution and this court (in *Boyd* v. *United States,* 116 U. S. 616, in *Weeks* v. *United States,* 232 U. S. 383, and in *Silverthorne Lumber Co.* v. *United States,* 251 U. S. 385) have declared the importance to political liberty and to the welfare of our country of the due observance of the rights guaranteed under the Constitution by these two Amendments. The effect of the decisions cited is: that such rights are declared to be indispensable to the 'full enjoyment of personal security,

---

[2] See Title XI of the Act of June 15, 1917, 40 Stat. 217, 228, now Rule 41 of the Federal Rules of Criminal Procedure. For a table of congressional legislation, indicating its scope, see the Appendix to the dissenting opinion in *Davis* v. *United States,* 328 U. S. 582, 616.

[3] See also an analysis of the cases in the Appendix to the dissenting opinion in *Harris* v. *United States,* 331 U. S. 145, 175.

personal liberty and private property'; that they are to be regarded as of the very essence of constitutional liberty; and that the guaranty of them is as important and as imperative as are the guaranties of the other fundamental rights of the individual citizen,— the right, to trial by jury, to the writ of *habeas corpus* and to due process of law. It has been repeatedly decided that these Amendments should receive a liberal construction, so as to prevent stealthy encroachment upon or 'gradual depreciation' of the rights secured by them, by imperceptible practice of courts or by well-intentioned but mistakenly over-zealous executive officers."

8. The opinion of the Court insists, however, that its major premise—that an arrest creates a right to search the place of arrest—finds support in decisions beginning with *Weeks* v. *United States,* 232 U. S. 383. These decisions do not justify today's decision. They merely prove how a hint becomes a suggestion, is loosely turned into dictum and finally elevated to a decision. This progressive distortion is due to an uncritical confusion of (1) the right to search the person arrested and articles in his immediate physical control and (2) the right to seize visible instruments or fruits of crime at the scene of the arrest with (3) an alleged right to search the place of arrest. It is necessary in this connection to distinguish clearly between prohibited searches and improper seizures. It is unconstitutional to make an improper search even for articles that are appropriately subject to seizure when found by legal means. *E. g., Amos* v. *United States,* 255 U. S. 313; *Byars* v. *United States,* 273 U. S. 28; *Taylor* v. *United States,* 286 U. S. 1. Thus, the seizure of items properly subject to seizure because in open view at the time of arrest does not carry with it the right to search for such items.

The doctrine of the right to search the place of arrest announced today rests on the precarious foundation of this passage in the *Weeks* case:

"What then is the present case? Before answering that inquiry specifically, it may be well by a process of exclusion to state what it is not. It is not an assertion of the right on the part of the Government, always recognized under English and American law, to search the person of the accused when legally arrested to discover and seize the fruits or evidences of crime. This right has been uniformly maintained in many cases. 1 Bishop on Criminal Procedure, § 211; Wharton, Crim. Plead. and Practice, 8th ed., § 60; *Dillon* v. *O'Brien and Davis,* 16 Cox C. C. 245. . . . Nor is it the case of burglar's tools or other proofs of guilt found upon his arrest within the control of the accused." 232 U. S. 383, 392.

The statement does not even refer to a right to search the place of arrest, and the authorities cited merely support the assertion of a right to search the person arrested and to seize visible instruments or fruits of crime.[4]

The authority to search which flows from the right to arrest was next discussed by this Court in *Carroll* v. *United States,* 267 U. S. 132, 158:

"When a man is legally arrested for an offense, whatever is found upon his person or in his control which it is unlawful for him to have and which may be used to prove the offense may be seized and held as evidence in the prosecution."

---

[4] A fair sample is § 60 of Wharton, Crim. Plead. and Practice, 8th ed.: "Right to Take Money from the Person of the Defendant," which discusses only the right to search the person arrested. Again, in *Dillon* v. *O'Brien and Davis,* 16 Cox C. C. 245, the issue was the right of arresting officers to seize apparent evidences of crime, not their right to rifle files in an effort to turn up the evidence.

While broader than the *Weeks* statement, this is still far from claiming the right to search a place merely because of an arrest there. What was said in the earlier case about articles in the control of the arrested person not being in issue is now stated positively as a right to seize whatever is found in the control of the person arrested. This *Carroll* statement is based on what was said in *Weeks,* and on two State cases which did not enunciate a right to search the place of arrest.[5]

These limited statements in the *Weeks* and *Carroll* opinions were uncritically expanded in *Agnello* v. *United States,* 269 U. S. 20, 30:

> "The right without a search warrant contemporaneously to search persons lawfully arrested while committing crime and to search the place where the arrest is made in order to find and seize things connected with the crime as its fruits or as the means by which it was committed, as well as weapons and other things to effect an escape from custody, is not to be doubted. See *Carroll* v. *United States,* 267 U. S. 132, 158; *Weeks* v. *United States,* 232 U. S. 383, 392."

If such a right was "not to be doubted" it certainly cannot be supported by the cases cited. *Carroll* and *Weeks* may

---

[5] *Getchell* v. *Page,* 103 Me. 387, 69 A. 624, was an action for trespass for the seizure of accoutrements of liquor-making under a warrant which authorized the search and seizure of intoxicating liquor. The decision that the officer was not liable for the seizure under those circumstances does not support an independent right to search the place of arrest. In *Kneeland* v. *Connally,* 70 Ga. 424, 425, the other case cited, the court actually held that the trial court had no jurisdiction of the case. It went on to say that "just as a warrant to arrest a man charged with murder would carry with it authority to seize the bloody knife or smoking pistol which killed," the instruments of the crime of gaming could be seized in arresting a proprietor of a gambling house. But once again no authority to search for these instruments was suggested.

have established a right to seize visible evidences of crime and to search the person arrested and even objects he physically controls, but neither case so much as hints that there is a right to search the entire place of arrest for "things connected with the crime."

In *Marron* v. *United States,* 275 U. S. 192, these carelessly phrased dicta were for the first time reflected in the result. The statement in the opinion that officers "had a right without a warrant contemporaneously to search the place in order to find and seize the things used to carry on the criminal enterprise," 275 U. S. at 199, was drastically qualified by *Go-Bart Co.* v. *United States,* 282 U. S. 344, and *United States* v. *Lefkowitz,* 285 U. S. 452. The teaching of those cases is that the warrant of arrest carries with it authority to seize all that is on the person, or in such immediate physical relation to the one arrested as to be in a fair sense a projection of his person. The *Lefkowitz* decision emphasized that the things seized in *Marron* "being in plain view were picked up by the officers as an incident of the arrest. No search for them was made." 285 U. S. at 465. Thus explained, *Marron* stands merely for the historically justified right to seize visible instruments of crime at the scene of the arrest.

In reliance on the prior dicta and on the *Marron* decision, it was asserted in *Harris* v. *United States,* 331 U. S. 145, 150, that "Search and seizure incident to lawful arrest is a practice of ancient origin." Literally, this is true: the right to search the person arrested and to seize visible instruments of crime has a good legal title. But judicial history cannot be avouched if this statement is meant to cover the right to search the place of arrest. Such a claim can only be made by sliding from a search of the person to a search for things in his "possession" or "in his immediate control," without regard to the treacherous ambiguity of these terms, and then using

these phrases, taken out of their original context, so as to include the entire premises.

The short of it is that the right to search the place of arrest is an innovation based on confusion, without historic foundation, and made in the teeth of a historic protection against it.

9. If the exception of search without a warrant incidental to a legal arrest is extended beyond the person and his physical extension, search throughout the house necessarily follows. I am aware that most differences in the law depend on differences of degree. But differences though of degree must not be capricious; the differences must permit rational classification. If upon arrest you may search beyond the immediate person and the very restricted area that may fairly be deemed part of the person, what rational line can be drawn short of searching as many rooms as arresting officers may deem appropriate for finding "the fruits of the crime"? Is search to be restricted to the room in which the person is arrested but not to another open room into which it leads? Or, take a house or an apartment consisting largely of one big room serving as dining room, living room and bedroom. May search be made in a small room but not in such a large room? If you may search the bedroom part of a large room, why not a bedroom separated from the dining room by a partition? These are not silly hard cases. They put the principle to a test. The right to search an arrested person and to take the stuff on top of the desk at which he sits has a justification of necessity which does not eat away the great principle of the Fourth Amendment. But to assume that this exception of a search incidental to arrest permits a free-handed search without warrant is to subvert the purpose of the Fourth Amendment by making the exception displace the principle. History and the policy which it represents alike admonish against it.

80

10. To tear "unreasonable" from the context and history and purpose of the Fourth Amendment in applying the narrow exception of search as an incident to an arrest is to disregard *the* reason to which reference must be made when a question arises under the Fourth Amendment. It is to make the arrest an incident to an unwarranted search instead of a warrantless search an incident to an arrest. The test by which searches and seizures must be judged is whether conduct is consonant with the main aim of the Fourth Amendment. The main aim of the Fourth Amendment is against invasion of the right of privacy as to one's effects and papers without regard to the result of such invasion. The purpose of the Fourth Amendment was to assure that the existence of probable cause as the legal basis for making a search was to be determined by a judicial officer before arrest and not after, subject only to what is necessarily to be excepted from such requirement. The exceptions cannot be enthroned into the rule. The justification for intrusion into a man's privacy was to be determined by a magistrate uninfluenced by what may turn out to be a successful search for papers, the desire to search for which might be the very reason for the Fourth Amendment's prohibition. The framers did not regard judicial authorization as a formal requirement for a piece of paper. They deemed a man's belongings part of his personality and his life. In dealing with the question, this Court in *United States* v. *Lefkowitz,* 285 U. S. 452, 464, approvingly cited what was said by Judge Learned Hand in *United States* v. *Kirschenblatt,* 16 F. 2d 202, 203:

> "Whatever the casuistry of border cases, it is broadly a totally different thing to search a man's pockets and use against him what they contain, from ransacking his house for everything which may incriminate him, once you have gained lawful entry, either

by means of a search warrant or by his consent. The second is a practice which English-speaking peoples have thought intolerable for over a century and a half. It was against general warrants of search, whose origin was, or was thought to be, derived from Star Chamber, and which had been a powerful weapon for suppressing political agitation, that the decisions were directed, of which Entick v. Carrington, 19 How. St. Trials, 1029, is most often cited. These cases were decided just after the colonists had been hotly aroused by the attempt to enforce customs duties by writs of assistance, and when within 30 years they framed the Fourth Amendment it was general warrants that they especially had in mind. Boyd v. U. S., 116 U. S. 616 . . . .

"After arresting a man in his house, to rummage at will among his papers in search of whatever will convict him, appears to us to be indistinguishable from what might be done under a general warrant; indeed, the warrant would give more protection, for presumably it must be issued by a magistrate. True, by hypothesis the power would not exist, if the supposed offender were not found on the premises; but it is small consolation to know that one's papers are safe only so long as one is not at home. Such constitutional limitations arise from grievances, real or fancied, which their makers have suffered, and should go pari passu with the supposed evil. They withstand the winds of logic by the depth and toughness of their roots in the past. Nor should we forget that what seems fair enough against a squalid huckster of bad liquor may take on a very different face, if used by a government determined to suppress political opposition under the guise of sedition."

11. By the Bill of Rights the founders of this country subordinated police action to legal restraints, not in order to convenience the guilty but to protect the innocent. Nor did they provide that only the innocent may appeal to these safeguards. They knew too well that the successful prosecution of the guilty does not require jeopardy to the innocent. The knock at the door under the guise of a warrant of arrest for a venial or spurious offense was not unknown to them. Compare the statement in *Weeks* v. *United States,* 232 U. S. 383, 390, that searches and seizures had been made under general warrants in England "in support of charges, real or imaginary." We have had grim reminders in our day of their experience. Arrest under a warrant for a minor or a trumped-up charge has been familiar practice in the past, is a commonplace in the police state of today, and too well-known in this country. See *Lanzetta* v. *New Jersey,* 306 U. S. 451. The progress is too easy from police action unscrutinized by judicial authorization to the police state. The founders wrote into the Constitution their conviction that law enforcement does not require the easy but dangerous way of letting the police determine when search is called for without prior authorization by a magistrate. They have been vindicated in that conviction. It may safely be asserted that crime is most effectively brought to book when the principles underlying the constitutional restraints upon police action are most scrupulously observed.

The highly experienced Commission on Law Observance and Enforcement appointed by President Hoover spoke of "the high standards of conduct exacted by Englishmen of the police." Vol. IV Reports of the National Commission on Law Observance and Enforcement ("Lawlessness in Law Enforcement") p. 259. It is suggested that we cannot afford the luxury of such

theoretically desirable subordination of the police to law because greater obedience to law is part of English life generally. I do not think that acceptance of lower standards than those prevailing in England should be written by us into law. That only serves to encourage low standards, not to elevate them. It is unfair to our people to suggest that they cannot attain as high standards as do the British in guarding against police excesses without impairing effective means for combatting crime. Experience proves that it is a counsel of despair to assume that the police cannot be kept within the bounds of the principles which the Fourth and Fifth Amendments embody except at the cost of impotence in preventing crime and dealing sternly with its commission.

12. To say that the search must be reasonable is to require some criterion of reason. It is no guide at all either for a jury or for district judges or the police to say that an "unreasonable search" is forbidden—that the search must be reasonable. What is the test of reason which makes a search reasonable? The test is the reason underlying and expressed by the Fourth Amendment: the history and the experience which it embodies and the safeguards afforded by it against the evils to which it was a response. There must be a warrant to permit search, barring only inherent limitations upon that requirement when there is a good excuse for not getting a search warrant, i. e., the justifications that dispense with search warrants when searching the person in his extension, which is his body and that which his body can immediately control, and moving vehicles. It is for this Court to lay down criteria that the district judges can apply. It is no criterion of reason to say that the district court must find it reasonable.

13. Even if the test of reasonableness is to be taken out of the context of the history and purpose of the

84

Fourth Amendment, the test should not be limited to examination of arresting officers' conduct in making the arrest. Their conduct prior to arrest is no less relevant. In any event, therefore, the presence or absence of an ample opportunity for getting a search warrant becomes very important. It is not a rule of thumb. It is a rule of the Fourth Amendment and of the reasons for its adoption. It is not a rule invented in *Trupiano* v. *United States,* 334 U. S. 699. It is not a rule of those who came on this Court in recent years. The decision in *Taylor* v. *United States,* 286 U. S. 1, turned on it. It was not a sentimental Court that stated in *Taylor:*

> "Although over a considerable period numerous complaints concerning the use of these premises had been received, the agents had made no effort to obtain a warrant for making a search. They had abundant opportunity so to do and to proceed in an orderly way even after the odor had emphasized their suspicions; there was no probability of material change in the situation during the time necessary to secure such warrant. Moreover, a short period of watching would have prevented any such possibility." 286 U. S. at 6.

That the arrest in that case was made after the search was begun does not affect its importance. Opportunity to obtain a search warrant is either relevant or irrelevant in determining the application of the Fourth Amendment. As the Court conceives the test of unreasonableness, different factors may be given varying weight. But opportunity to obtain a warrant cannot be relevant in one situation and totally irrelevant in another. That is the significance of the *Taylor* case.

In the case before us there is not the slightest suggestion that the arresting officers had not the time to

secure a search warrant. The arrest and search were made on February 16, 1943. On February 1, there was strong evidence that respondent had in his possession large numbers of stamps bearing forged overprints, in violation of 18 U. S. C. § 265. On February 6, a postal employee purchased from respondent four stamps bearing overprints and, on February 9, reports were received showing the overprints to be forgeries. Thus, the Government had at least seven, and more accurately fifteen, days in which to procure a search warrant. Nor was this a case in which the need for a search became apparent at the time of arrest. The arresting officers were accompanied by two stamp experts, whose sole function was to examine the fruits of the search which they knew would be made. This is hardly a natural description of a "search incidental to an arrest."

It is most relevant that the officers had "no excuse for not getting a search warrant," 176 F. 2d 732, 735, for that is precisely what the Fourth Amendment was directed against—that some magistrate and not the police officer should determine, if such determination is not precluded by necessity, who shall be rummaging around in my room, whether it be a small room or a very large room, whether it be one room, or two rooms, or three rooms, or four rooms.

14. It is not as though we are asked to extend a mischievous doctrine that has been shown to hamper law enforcers. We are asked to overrule decisions based on a long course of prior unanimous decisions, drawn from history and legislative experience. In overruling *Trupiano* we overrule the underlying principle of a whole series of recent cases: *United States* v. *Di Re,* 332 U. S. 581; *Johnson* v. *United States,* 333 U. S. 10; *McDonald* v. *United States,* 335 U. S. 451, based on the earlier cases. For these cases ought not to be allowed to remain as

derelicts on the stream of the law, if we overrule *Trupiano*. These are not outmoded decisions eroded by time. Even under normal circumstances, the Court ought not to overrule such a series of decisions where no mischief flowing from them has been made manifest. Respect for continuity in law, where reasons for change are wanting, alone requires adherence to *Trupiano* and the other decisions. Especially ought the Court not reenforce needlessly the instabilities of our day by giving fair ground for the belief that Law is the expression of chance—for instance, of unexpected changes in the Court's composition and the contingencies in the choice of successors.