THE PEOPLE OF PUERTO RICO, Plaintiff and Appellee, *v.* WILFREDO LASTRA SÁEZ, Defendant and Appellant.

No. CR-66-11.    Decided January 27, 1967.

*Edna Abruña Rodríguez* for appellant. *J. B. Fernández Badillo, Solicitor General,* and *Américo Serra, Assistant Solicitor General,* for The People.

MR. JUSTICE RAMÍREZ BAGES delivered the opinion of the Court.

Appellant Lastra Sáez was convicted of two offenses of burglary in the first degree. He was ordered to serve from one to four years in the penitentiary. The cases were tried jointly by the court after appellant waived his right to trial by jury. He assigns that said conviction was based on a confession he was induced to make when he was confronted with certain jewels and money obtained as a result of his illegal arrest and the illegal search of a package he was carrying. We do not agree, according to the evidence appearing in the record and the findings of fact inferred therefrom and which we set forth below:

On December 25, 1964 at 11:00 a.m. a telephone call came through at police station of the town of Naranjito, from the police of the town of Barranquitas. As a result of this call, policeman Zacarías Albino Ibarra, who was on duty in Naranjito and who was at the station of that town when the call came, was ordered to detain automobile license plate No. PA-243-186. He was told "that in that car there was a person who was wanted for investigation; that Wilfredo Lastra Sáez was traveling in that car and the chauffeur was Cristóbal Colón"; and that "the police of Barranquitas wanted

Wilfredo Lastra Sáez." Said policeman went to the *entrance* of the town of Naranjito to wait for the automobile to pass by. He testified that:

"At the outskirts of the town, at kilometer 6.5, I saw the automobile coming, I stopped the patrol car and ordered the vehicle to stop, when this young man [Lastra Sáez] who was traveling on the right-hand side . . . opened the door and darted out with the intention of running away and I jumped out of the patrol car and I held him by the arm and stopped him.

"I told him to go with me to police station for investigation in relation to a burglary which occurred in Barranquitas. Right there I asked him whether he was carrying packages in the car and he denied it and then the chauffeur told me yes, that there was a package . . . .

". . . and he himself [the defendant] accepted that it was a package containing clothes. He and the chauffeur opened the trunk and I searched and there was a large sum of money.

"There were dimes, nickels, half dollars, silver dollars, and two watches."

On questioning by the prosecuting attorney as to whether he [the policeman] had talked to the defendant in relation to what he had seen in the package, the policeman replied:

"Immediately after I saw the package he told me it belonged to a certain Panchito, that he had taken it [he refers to the money] from the business of a certain Panchito, that now I know is Francisco Berríos."

Prosecuting Attorney: "In addition to speaking to you about the money, did he say anything else?"

Policeman: "That the watch belonged to Francisco, that it was in Francisco's business. Also, the watch of a lady, whose name I cannot remember, she is in court now; that he had taken it away the same night that he took the money from that business."

Once the policeman saw what was in the package, he proceeded:

"I took him to police station; I took the bag to police station and we called the police of Barranquitas and told them that we

had detained the vehicle. Then policeman, Pantaleón Quiles arrived and drove the two of us to Barranquitas.

"At police station in Barranquitas, as Panchito, Francisco Berríos, complained that there was money missing, policeman Pantaleón Quiles talked to him and he [the defendant] informed him that the money in bills . . . .

"What Wilfredo Lastra said to policeman Quiles in my presence in relation to the money which was missing in bills, because what I seized from him was the change in coins, was that the missing money was in possession of Wilfredo Lastra's wife, and policeman Pantaleón Quiles went to the residence of defendant herein and brought the other amount of money which was missing."

■■ The trial judge ruled that the search of the package in question, as well as the search of appellant's residence, were illegal and that the fruit of such searches was not admissible in evidence. On the other hand, he sustained that the defense could offer evidence as to whether the confession was induced by appellant's confrontation with the money and the jewels mentioned.

On direct examination for the purpose of establishing that the confession was induced by the confrontation of Lastra Sáez with the money and the jewels, the latter testified:

"Yes, sir, I was induced to offer that testimony."

"Why did you offer it?"

"I was induced because they showed me those objects that were taken from the car in which I was going home, and they showed them right in front of me and I testified upon seeing so many things, even some of my underwear inside that package, which I put into the package because I did not know anything about that."

"Did you testify induced by the objects that were shown to you?"

"Yes, sir."

"Was that the only reason for you to testify that?"

"Yes, sir."

The prosecuting attorney, in his turn, asked:

"Then the policeman arrested you when you were traveling in the car and at that time he did not show you the jewels, you did not see them at any time?"

"No, sir."

"You do not know where the policeman got the jewels, you did not see from where he got them, you do not know whether they were inside the trunk of the car?"

"In his testimony he says he took them from there?"

As to the jewels, defendant stated that he did not know to whom they belonged. On being questioned by the prosecuting attorney as to whether the jewels caused him some fear, defendant answered:

A.—"Sure, because they were involving me; they were trying to involve me."

Q.—"Why did you let them involve you?"

A.—"Because I asked them to bring an attorney in order to testify and they refused and asked me and they did this to me on my face with a club."

Q.—"And you offered your testimony because you asked for an attorney and they did not designate him?"

A.—"They did not designate him."

Q.—"Was that the reason?"

A.—"No, sir, because they showed me the jewels."

The judge intervenes and asks the defendant:

Q.—"Say, sir, I want you to clarify this for me: then, when the policeman searches the package, did he open it in your presence?"

A.—"No, sir."

Q.—"You do not know where the policeman opened the package?"

A.—"At the police station in Naranjito, in a back room."

Q.—"Then, did he bring it to you already open?"

A.—"No, he told me: 'what a good loot you are carrying.'"

Q.—"Did he not show you the jewels?"

A.—"No, sir, not until he reached the police station at Barranquitas."

The judge proceeds with defendant's interrogatory:

Q.—"Then you reached the police station in Barranquitas, and what did the policeman do?"

A.—"Policeman Albino did not show up at the cell where I was; policeman Quiles was the one who went there."

Q.—"What did policeman Quiles do?"

A.—"He told me to take off my clothes to search me and I consented."

Q.—"As to the package?"

A.—"They did not show me the package."

Q.—"Did they ever show you the package, either in Naranjito or in Barranquitas?"

A.—"Yes, in Barranquitas."

Q.—"When?"

A.—"When they took me out of prison to go to testify."

Q.—"Then when they took you out of prison to testify, where did you see the package?"

A.—"On the desk. . . ."

"Did any of the officials tell you that this package had been seized in the car?" (Judge's question.)

A.—"It was seized in the car you were traveling, policeman Zacarías told me."

Q.—"And where did you see the package before you testified?"

A.—"There was no package at all, because everything was scattered."

Q.—"What did you see?"

A.—"I saw money and jewels."

Q.—"You say that you never had in your possession that money and those jewels, that is, that you did not know about those jewels nor to whom they belonged?"

A.—"No, sir."

Q.—"You did not know either to whom the money belonged?"

A.—"No, sir."

Q.—"Then, how could you be induced to testify what you testified, how could you be induced by the fact that you were shown a thing with which you had nothing to do, and with which you were not connected?"

A.—"Because my detention was ordered·and the induction was because I was detained by the order of the police."

Q.—"Was that the only thing that induced you to ·testify?"

A.—"And apparently *they wanted to put pressure on me, there was too much pressure.*" (Italics ours.)

The judge proceeds with his interrogatory:

Q.—"To clarify this situation: when you were confronted with said package, with the objects it contained, the money, and the jewels, some jewels which were not yours, which you had not taken or put in any package whatsoever, nor were carrying them in the car with you, what did those jewels and that money have to do with the testimony you offered, if you had nothing to do with said jewels?"

A.—"The *fear they would attack me, because they had me in their hands.*" (Italics ours.)

Q.—"So that you offered the confession, not because you were confronted with those jewels, but because you were going to be attacked?"

A.—"*Because of fear.*" (Italics ours.)

Q.—"For fear you would be attacked."

A.—"Yes, sir."

Previously, on examination by the prosecuting attorney, the defendant testified that he had been threatened with a club, that he *requested* an attorney and no attorney was assigned to him and that in relation to the jewels:

". . . and with the jewels·they told me from all sides: 'this is yours.' 'Whose is this?' and I am in such a nervous condition that I am also under psychiatric treatment; that I cannot be upset too much; I even tried to kill my wife, three months pregnant, under a fit of anger."

Subsequent to these events, the judge decided that:

"Thus, under said circumstances, and as a result of defendant's own evidence in the sense that the reason why he offered his testimony is not that he was induced by the presentation of the objects, the product or fruit of the burglary, by the policeman, but because he says he is a nervous person,·who is under psychiatric treatment, and that the policeman threatened him

with his club, that he was barely permitted to answer and that as a result of that coercion exercised by the policeman he made his sworn statement; now the prosecuting attorney has the right to rebut . . . said evidence . . . ."

The prosecuting attorney offered as rebuttal the testimony of José Colón Santini, justice of the peace, in order to establish that the sworn statement offered by the defendant was voluntary. He testified that he made to the defendant the pertinent legal warnings, including that of communicating with an attorney and retaining his services; that defendant had stated that he wanted to testify voluntarily; that he did not show any traces of bruises or cuts, or that he had been bit, attacked, or hurt, or that he complained that he had been. He explained how he had taken the sworn statement as follows:

". . . and as he was making his sworn statement, explaining how he had enterred Berríos' business, how he had gone to Mrs. Meléndez' house, where he had deposited the money, how the money had been found by the police of Naranjito; all that statement is in the possession of the prosecuting attorney, which he went on explaining and the policeman taking down."

The justice of the peace stated that nobody else had put questions to defendant; that there were people of the town and the witnesses; that there were about four or five policemen; that while he was examining him he was showing him the objects, and the defendant recognized them and said what had happened.

Upon being examined again by the attorney for the defense, he affirmed:

"If you did not commit those burglaries, why did you sign a sworn statement?"

"For fear they would fulfill the promise they had made; as the judge was not there, when I heard what they told me, and I found myself so deep in problems, so many things, I felt trapped and I had to give the sworn statement."

On examination by the prosecuting attorney:

"Then, the reason why you testified was the policemen's threats?"

"The threats and the evidence the judge showed me."

"If the judge had not shown you that, you would not have testified?"

"I would have testified anyway because I had seen it."

The confession of Lastra Sáez signed before the aforementioned justice of the peace shows that he had been given the warnings not to testify and that what he testified could be used against him. But it does not show that he was warned as to his right to have legal aid during the examination nor that he waived that right voluntarily and intelligently. We set forth said confession below.

"That in the early morning of December 25, about 3:00 a.m., I broke into Francisco Berríos Concepción's commercial establishment situated on El Río Street of Barranquitas, where I found an open door and from there I took three paper bags containing a certain amount of money in dollar bills of different denominations, which amount I took home situated on the same El Río Street, where I deposited said amount of money in a white plastic bag without knowing the amount I had taken from said establishment. That this morning, about 9:00 a.m. I came downtown and I had the intention of delivering the money to its owner, but I saw him talking to policeman Quiles and then I chose to rent an automobile and go to my mother's house and then come back with her to resolve this case in friendly terms with Panchito. That I rented Cristobal Colón Delgado's car, and accompanied by my wife, Ana María Alicea, I took the plastic bag containing the money, but on reaching Naranjito a policeman stopped the car seizing therein the plastic bag containing the money taken from Panchito Berríos' store."

The justice of the peace asks:

"Then a Bulova watch and a ring with a green stone which I am showing to you and which were seized by the policeman of Naranjito in the automobile in which you were traveling, where did you get them?

Answer: This I took also together with the money from Francisco Berríos' business."

Said judge asks:

"When this lady's silver-plated Bulova watch that I am showing to you and which was also seized by the policeman in Naranjito in the automobile in which you were traveling, where did you get it?

Answer: I entered Elba Luisa Meléndez' house on El Río Street through a door which stood ajar about 9:30 p.m., and from there I took a lady's Bulova watch with its light-gray plastic case and also a pair of rubber gloves which were seized by the policeman in Naranjito in the car which was taking me to Bayamón."

The justice of the peace asks:

"As to this burglary which you committed in Mrs. Maléndez' [*sic*] house you also ratify that you make your sworn statement freely and voluntarily after being warned of your right, as presumptive accused, to testify or not testify on the facts under investigation and of which you are accused?

Answer: Yes, sir, I testify freely and voluntarily on these facts."

■ Appellant's legal aid maintains that the evidence shows that appellant's confession arose as a result of the confrontation with the jewels seized; that pursuant to the ruling in *People* v. *Rodríguez Rivera*, 91 P.R.R. 442 (1964), they were not admissible in evidence. On the contrary, the Solicitor General states that appellant testified that he confessed because of the fear of being attacked. On the other hand, in his argument the Solicitor General refers to the money and the jewels shown to Lastra Sáez at the police station in Barranquitas as "fruit of the illegal search." He did not challenge the conclusion of the trial court that, actually, the arrest of Lastra Sáez as well as the search of the package he was carrying in the automobile were illegal; that is, in effect that his detention constituted an arrest performed without a previous warrant and without a well-

founded cause to believe that Lastra Sáez had committed a felony. That Lastra Sáez was wanted for investigation meant that he was a suspect. The mere suspicion is not the probable cause or the well-founded reason to justify the arrest. *United States* v. *Rabinowitz*, 339 U.S. 56 (1950). Therefore, as a result of that conclusion not challenged by the prosecuting attorney, the jewels and the money that one of them found in the package located in the trunk of the vehicle in which Lastra Sáez was traveling were illegally seized. We conclude, however, that appellant did not establish that his confession was induced by his confrontation with the money and the jewels obtained through the search in question. *People* v. *Rodríguez Rivera, supra.*

Lastra Sáez' testimony as to the motive for the confession was contradictory. Sometimes he said that he was induced because the jewels were shown to him, which caused him fear, and on cross-examination he testified that he confessed for fear of being attacked.

The evidence that the confession was induced by the confrontation with the "fruits" of an illegal search does not have to establish that fact beyond a reasonable doubt. It should only indicate that there was a reasonable possibility that the evidence complained of might have contributed to the conviction. *Fahy* v. *Connecticut*, 375 U.S. 85, 86 (1963).

Having been induced is the result of a frame of mind difficult to reproduce in all its gamut of reactions, but which is made manifest quite perceptibly on the basis of the facts or circumstances which occurred. Defendant's mere conclusion that he was induced is not sufficient. But in the case at bar the trial judge had substantial grounds in the evidence to conclude that appellant's confession before the justice of the peace was not induced by the confrontation with the money and the jewels which were shown to him. Appellant testified that said objects were not his and he did not know to whom they belonged. When he was asked how he

could be induced to confess to something with which he had nothing to do and with which he was not connected, he answered that it was because they wanted to press him, for fear that the police would attack him for they had threatened him with a club. The evidence also showed that there was no alleged coercion, for appellant was taken directly before the justice of the peace, who was the only person who asked him questions in the presence of other persons and several policemen, and that he was not threatened, and showing, on the contrary, that appellant testified voluntarily. It was not shown that the trial judge acted with passion, prejudice, or partiality in making the preceding conclusions of law.

The confession was obtained without warning appellant, before starting his interrogatory and after appellant had already been captured and deprived of his liberty, in a significant manner, of his right to legal aid at that time. Neither the confession nor the record show that appellant had waived that right voluntarily and intelligently.

■ As the trial was held during the days of April 8, 12, and 20, 1965, the doctrine for the exclusion of confessions obtained when defendant is examined without legal representation while detained during the accusatory stage and deprived of his liberty in a significant manner, which we established in *Rivera Escuté* v. *Delgado, Warden,* 92 P.R.R. 746 (1965) is not applicable to the case at bar, since in *People* v. *Adorno Lorenzana, ante,* p. 768 we decided that said doctrine is applicable in cases where the trial is held after the aforementioned date of October 26, 1965.

In view of the foregoing, the judgment rendered in this case on April 20, 1965 in the Superior Court, Guayama Part, will be affirmed.

Mr. Justice Santana Becerra concurs in the result in a separate opinion.

—O—

Separate opinion of MR. JUSTICE SANTANA BECERRA.

San Juan, Puerto Rico, January 27, 1967

I concur with the result, because I am not in a condition, according to the record, to categorically affirm that the police did not have reasonable cause for believing that the person about to be arrested had committed a felony, regardless of whether or not the said offense was actually committed. Rule 11 (c) of the Rules of Criminal Procedure.