Kenneth C. **LOCKETT**, Appellant,

v.

**UNITED STATES** of America, Appellee.

No. 21276.

United States Court of Appeals Ninth Circuit.

Jan. 3, 1968.

Rehearing Denied March 5, 1968.

Roger M. Schrimp (argued), Modesto, Cal., Kenneth C. Lockett, Steilacoom, Wash., for appellant.

Cecil F. Poole, U. S. Atty., James J. Simonelli, Special Asst. U. S. Atty., San Francisco, Cal., for appellee.

Before CHAMBERS, POPE and MERRILL, Circuit Judges.

POPE, Circuit Judge.

In October, 1965, at a place called Drytown, Amador County, California, east of Sacramento, there was located a general store which housed a country post office. The portion devoted to the post office was in one corner of the store and at that place held stamps, post office forms, including money order forms, post office cash, and post office paraphernalia. The money order forms were kept in a cigar box in a safe.

In the early morning of October 10, 1965, a deputy sheriff of the county, accompanied by a Jackson City police officer, discovered that the door of the store had been opened and left ajar and on entering the building they discovered that the safe in the post office section had been opened and money and other articles taken from it. The cigar box and the postal money order forms were gone. Missing were 99 money orders bearing certain serial numbers and a seal or stamp used in issuing money orders.

Three days later, on October 13, 1965, the appellant and one Ehrig were arrested in Huntington Park, near Los Angeles, while attempting to cash one of the

money orders which had disappeared from the Drytown Post Office. United States postal inspectors were notified of the arrest and Postal Inspector Petersen went to the Huntington Park police station to interrogate both men. Ehrig talked, but the appellant asserted that he had nothing to say. While Petersen was interrogating both men, Lockett said to Ehrig: "Don't you worry about it. If it gets to that point, I did it and they can stick me. If it gets to that point I did it so don't worry about it." At that time Inspector Petersen, who had with him some other postal inspectors, was inquiring particularly about the location of the material which had been taken from the post office in an endeavor to recover the stolen money orders. Ehrig had confessed to the burglary and had implicated Lockett. He told how after the burglary they had driven to the San Francisco Airport in Lockett's car and parked it at the Airport parking lot. He told where the car was located and described it and stated that it contained some of the material taken from the post office. After the car had been thus parked, the two men flew to Los Angeles. They had succeeded in cashing a forged money order, one of the forms which had been stolen, and were attempting to cash a second one when the store manager with whom they were negotiating became suspicious and called the police and their arrest followed.

In his testimony Inspector Petersen said that he telephoned Postal Inspector Morbello at San Francisco asking him to locate the automobile. Inspector Morbello sent some one to locate the automobile, who found it where Ehrig had said it would be found; he took the license number and then, through inquiries at Sacramento, discovered that the car was registered in the name of Lockett at a Sacramento address. This occurred on October 14, the day following the arrest. Ehrig had revealed that some of the remaining money orders and other items stolen at the post office were in this car.

The appellant had been living with his mother and stepfather at the Sacramen-

to address mentioned and in the course of the investigation concerning the car the postal inspector at Sacramento telephoned to the appellant's mother. Shortly thereafter the appellant's stepfather called Inspector Morbello at San Francisco and advised him that he was a state probation officer of Sacramento County; that he did not want contraband in the car and offered to go to San Francisco to open the car. The stepfather had a duplicate set of car keys which had been left by the appellant at his home. The "legal owner" of the car was a bank which had loaned the money to purchase the vehicle and the stepfather was a co-signer upon the note to the bank. The stepfather did not testify and it is not entirely clear whether the stepfather's offer to open the car was prompted by his desire to avoid embarrassment because of his position as a probation officer or whether it was prompted by his desire to avoid loss to him as a co-signer which might have occurred if the car were forfeited because of its contraband contents. In describing what the stepfather said when he telephoned Inspector Morbello, the latter quoted him as saying: "He didn't want anything that might be contraband in the car." At any rate, Mr. Mervine, the stepfather, as promised, reached the Airport on the same day and used his duplicate set of keys to open the car. Before the car was opened, and while it was still locked, the inspector could observe a pile of clothes on the back seat which Inspector Petersen had told him would be found there, and on the front seat or in front of the front seat was a cigar box plainly visible from the outside.

In the car the officers found that the cigar box was empty, but under the front seat there were 57 forms for money orders and a stamp provided for use in issuing the money orders. The stamp carried on its face the words: "Sutter Creek Calif Drytown Cub Sta USPO." (The Drytown office was a substation of Sutter Creek.) Also found in the car were some tools which Ehrig said had

been taken along for use in opening the safe.

During the testimony of Inspector Morbello he testified that he searched the vehicle after it had been opened by the stepfather and he was asked to describe what he found in the car and what he recovered. The defense objected on the ground that there was no foundation for such a search; that he did not have the permission of the owner of the car, Lockett, to make such a search and objected to any evidence or testimony concerning the contents of the vehicle on the grounds that it was an unlawful search; and that the stepfather, notwithstanding he had been a co-signer on the note to the bank, had no authority to open the car or permit entry therein, or the search. The objection was overruled and Inspector Morbello proceeded to answer the inquiry as to what he found in the locked vehicle and to describe the 57 money order forms, identifiable by number, as having been assigned to the Drytown station and lost through the burglary. The court then admitted a photograph of the contents which were thus recovered by the inspector and the photograph was received in evidence. (Incidentally, when the photograph was offered counsel for the defense stated: "No objection, Your Honor.") The specification of error made by the appellant was as follows: "The trial court erred in overruling the objection of Appellant to testimony of Postal Inspector Morbello concerning his warrantless search of Appellant's automobile and to the introduction of evidence seized during Inspector Morbello's search."

Without considering what was the effect of defendant's statement that there was no objection to the introduction of the photograph of the materials found in the vehicle, we think it plain that the trial court was clearly right in ruling that Inspector Morbello could properly testify as to the materials and items found in the locked car belonging to Lockett.

▇ As authority for that conclusion we need only refer to §§ 781 to 784 of Title 49 U.S.C. and Cooper v. State of California, 386 U.S. 58, 87 S.Ct. 788, 17 L.Ed.2d 730. Section 781 defines contraband articles as follows:

"(a) It shall be unlawful (1) to transport, carry, or convey any contraband article in, upon, or by means of any * * vehicle, * * *; (2) to conceal or possess any contraband article in or upon any * * * vehicle * * * or upon the person of anyone in or upon any * * vehicle * * *; or (3) to use any * * * vehicle * * * to facilitate the transportation, carriage, conveyance, concealment, receipt, possession, purchase, sale, barter, exchange, or giving away of any contraband article.

(b) As used in this section, the term 'contraband article' means—

(1) * * *

(2) * * *

(3) Any falsely made, forged, altered, or counterfeit coin or obligation or other security of the United States or of any foreign government; *or any material or apparatus, or paraphernalia fitted or intended to be used, or which shall have been used, in the making of any such falsely made, forged, altered, or counterfeit coin or obligation or other security."* (Emphasis ours.)

It is plain that the postal money orders thus found in the Lockett vehicle, together with the stamp described above, were fitted to be used in making forged or counterfeit obligations of the United States. (This is precisely what Lockett and Ehrig did when they cashed the first of the money orders which they had filled out.)[1] They were contraband within the meaning of Title 49 § 781 (b) (3), supra. And because of what Ehrig had told

---

1. After leaving the car in San Francisco these parties had proceeded to Tijuana, Mexico, where they secured a false driver's license bearing the name Ronald Williams, which was the name of the payee on the forged money order. Evidently the purpose of the driver's license was for identification in cashing the money order.

them, the officers knew before it was opened that the car contained contraband.

It is plain from the record that when Morbello and the other officers searched the car they had physical possession of it. Without that possession search would have been impossible. Thus, it cannot be questioned but that at that moment the vehicle had been "seized" within the meaning of Title 49 § 782. That it was rightfully seized is crystal clear for Morbello and the others knew absolutely that it had been used to transport contraband from Drytown as Lockett and Ehrig fled from Drytown to San Francisco with their booty enroute to the Los Angeles area. This knowledge was positive for, as noted above, Ehrig had made a full confession to Inspector Petersen and this information had been passed on to Morbello by Petersen. The testimony was as follows: "Q. Did he indicate to you why it was true that you might likely find money orders in the vehicle? A. He indicated that the information had been passed on to him by Mr. Ehrig." Furthermore, Morbello had checked the license plates on the car and verified that the car belonged to Lockett through contact with the California Motor Vehicle Department. That Lockett and Ehrig had carried away postal money orders when they fled is certain because they had some of them when they attempted to cash them and were arrested. In this connection the language of § 782 should not be overlooked. To make it subject to seizure it was not necessary that the vehicle have within it any contraband at the time it was seized. The vehicle was subject to seizure if it *had been used* to transport this contraband.[2]

The record is silent as to whether after the officers had thus seized the automobile they instituted forfeiture proceedings. Since the case was being tried before a jury, testimony that forfeiture proceedings were instituted following the seizure would have been out of order during the trial. We must assume that the officers did in all respects conform to their duty under § 782 for, as noted in the last footnote, the language is that the vehicle "shall be" seized and forfeited. We must and do recognize the presumption that public officers have regularly performed their duty.

Even if the officers had failed to file forfeiture proceedings the result would be no different here because the important question is what were the rights of the officers at the moment of the search. At that moment they had performed their duty of seizure and what they thereafter did or neglected to do would be immaterial.

The rule we have just stated was propounded by this court in Kaplan v. United States, 9 Cir., 375 F.2d 895, 899. (Cert. den. 389 U.S. 839, 88 S.Ct. 67, 19 L.Ed. 2d 103). There the court said: "No search was made until *after* Tomsick had verified the fact the same vehicle had been used to transport a counterfeit $100 note to the Christmas tree lot, while Kaplan was driving. * * * He then had reasonable cause to believe the vehicle could be properly seized as a vehicle used to transport contraband. 49 U.S.C. §§ 781(a) (3) and (b) and (3); 782. Burge v. United States, 342 F.2d 408, (9 Cir. 1964). He did seize it."

Title 49 § 782, provides among other things as follows: "Any vessel, vehicle, or aircraft which has been or is being used in violation of any provision of section 781 of this title, or in, upon, or by means of which any violation of said section has taken or is taking place, shall be seized and forfeited." It was therefore not only the right but also the duty of the officers to seize and hold the vehicle for forfeiture. This makes precisely applicable the rule set forth in Cooper v. State of California, supra, 386 U.S. p. 61, 87 S.Ct. at p. 791: "Here the officers

2. Note the precise language of the first sentence of § 782 which is as follows: "Any vessel, vehicle, or aircraft which *has been* or is being used in violation of any provision of section 781 of this title, or in, upon, or by means of which any violation of said section *has taken* or is taking place, *shall be seized* and forfeited." (Emphasis ours.)

seized petitioner's car because they were required to do so by state law. They seized it because of the crime for which they arrested petitioner. They seized it to impound it and they had to keep it until forfeiture proceedings were concluded. Their subsequent search of the car—whether the State had 'legal title' to it or not—was closely related to the reason petitioner was arrested, the reason his car had been impounded, and the reason it was being retained. The forfeiture of petitioner's car did not take place until over four months after it was lawfully seized. It would be unreasonable to hold that the police, having to retain the car in their custody for such a length of time, had no right, even for their own protection, to search it. It is no answer to say that the police could have obtained a search warrant, for '[t]he relevant test is not whether it is reasonable to procure a search warrant, but whether the search was reasonable.' United States v. Rabinowitz, 339 U.S. 56, 66, 70 S.Ct. 430, 94 L.Ed. 653. Under the circumstances of this case, we cannot hold unreasonable under the Fourth Amendment the examination or search of a car validly held by officers for use as evidence in a forfeiture proceeding." See Carroll v. United States, 267 U.S. 132, 149, 45 S.Ct. 280, 69 L.Ed. 543 et seq.

It is plain from the record that what the stepfather did in opening the car was on his own motion. Of course he had no authority from Lockett to open the car and he had not been requested by the officers to open the car. There is no contention here that any officer thought the stepfather had any authority to open the car. Cf. Cunningham v. Heinze, 9 Cir., 352 F.2d 1, 4. The witness Morbello testified that "The car was opened by a key in the possession and opened by Mr. Mervine [the stepfather]." [3] It is not material here what prompted the stepfather to open the car and we find it unnecessary to inquire whether under the circumstances he had any right to open it. What we think is significant is that as the officers approached the car, the door was open, and lying before them on the seat was a cigar box which they could reasonably suspect had some connection with the stolen money orders. It would appear to be as reasonable for the postal inspector to reach in and repossess the post office property as it would be for a private property owner, observing his own stolen camera or other article on a seat in a car with the door open, to retrieve his own property.[4]

As stated in Cooper v. State of California, supra, the relevant test is "whether the search was reasonable". The evidence that had been communicated to the officers in this case was overwhelming. It identified Lockett as participating in the robbery; his companion Ehrig described the robbery in complete detail and informed the officers where the automobile which contained the contraband was located and that they would find the stolen money orders there —money orders which had been stored in

---

3. The stepfather, as noted above, had signed a note to the bank which provided the funds for the purchase of the car; he was a co-signer on the note to the "legal owner". It would be perfectly sound for him to assume that if contraband was found in the car it was subject to seizure and forfeiture under 49 U.S.C. § 782, supra, and he himself would stand to lose. United States v. One Ford Coupe, 272 U.S. 321, 332, 47 S.Ct. 154, 71 L.Ed. 279; United States v. Andrade, 9 Cir., 181 F.2d 42, 46; United States v. One 1957 Lincoln Premiere, 7 Cir., 265 F.2d 734, 736.

4. The postal inspector who interviewed Lockett and Ehrig, Mr. Petersen, made it plain his real interest was in recovering the post office materials. He said: "A. You are continually talking about cashing of money orders, whereas our conversation was more 'let's recover the money orders and the stamps, the little round stamp,' etc., which had come from the burglary. * * * Q. Now, during the course of your interview with Mr. Ehrig and Mr. Lockett were you primarily concerned with recovering the stolen money orders? A. Right. We had a burglary involved. These people were pretty solid, as far as we were concerned, on the cashing of the money orders. We wanted the burglary material."

a cigar box. It would be difficult to find a case where the search was more reasonable than this one.

■ Moreover, even if the search here were an unlawful one, the facts would make this case an almost classical one for application of the rule stated in Chapman v. State of California, 386 U.S. 18, 22, 87 S.Ct. 824, 827, 17 L.Ed.2d 705, as follows: "We conclude that there may be some constitutional errors which in the setting of a particular case are so unimportant and insignificant that they may, consistent with the Federal Constitution, be deemed harmless, not requiring the automatic reversal of the conviction."

The charge here was burglary of the Drytown Post Office. Defendant was caught with the goods on him. He had possession of the money order printed forms which were identified by number as two of those taken from the post office safe. These were introduced as Exhibits 2 and 4, terminal numbers 917 and 919, just as they had been filled out and sought to be cashed by the defendant. It is possible that some juror may have wondered what became of the rest of the stolen money orders but in the setting of this particular case, the fact that other money orders were in the defendant's car would be "unimportant and insignificant" and their receipt in evidence harmless.

■ We think that beyond a reasonable doubt the introduction of the matters taken from the automobile did not contribute to the verdict obtained,—if the receipt was erroneous it was "harmless beyond a reasonable doubt". Cf. Hernandez v. United States, 9 Cir., 353 F.2d 624, 628.

Accordingly, the judgment is affirmed.

MERRILL, Circuit Judge (dissenting):

I dissent and would remand for new trial.

I cannot agree that under Cooper v. State of California, 386 U.S. 58 (1967), this search was reasonable. Here the car was not in official custody, impounded as evidence incident to a forfeiture proceeding, as was the case in *Cooper*. Under those circumstances it is not the fact that the car had been engaged in unlawful activities that renders the warrantless search reasonable. Rather, it is the fact that the car is in official custody, incident to proceedings by which the Government will acquire title to it, and in which the car itself will constitute evidence. "Search" under such circumstances is little more than inspection of property one expects to acquire or which the law has required one to impound and retain as evidence. There is no issue which the judgment of a magistrate need resolve to establish reasonableness. The relationship between the car and its custodians and the purpose of the custody renders the "search" mere routine.

To extend the authority for warrantless search beyond such a case and into the area where the Government has not yet impounded and has no more than an apparent right to invoke forfeiture, is, in my judgment, wholly unjustifiable.

This remains a case where the only basis for the search was the expectation that it would produce contraband or evidence. Whether or not the search was reasonable depends upon the reasonableness of that expectation. It is firmly established that this is a determination that may only be made by a magistrate, save in cases where danger of loss or frustration creates a situation of urgency not present here.

Nor can I agree that under Chapman v. State of California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), admission of the products of the search was harmless error. It may well be that the proof, excluding the products of search, strongly points to guilt, but I do not understand this to be the proper test. The Supreme Court, at 386 U.S. 23, criticizes an approach involving "emphasis, and perhaps overemphasis, upon the court's view of 'overwhelming evidence' ". It then quotes Fahy v. State of Connecti-

cut, 375 U.S. 85, 86–87, 84 S.Ct. 229, 230, 11 L.Ed.2d 171 (1963):

> "The question is whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction."

The Court later states at 23–24, 87 S.Ct. at 828:

> "An error in admitting plainly relevant evidence which possibly influenced the jury adversely to a litigant cannot, under *Fahy*, be conceived of as harmless."

The products of the search here constituted the strongest possible corroboration of the admissions of the defendants. It is difficult to conceive how they could not have impressively influenced the jury and thereby contributed to the conviction.