UNITED STATES of America, Plaintiff-Appellee,

v.

Miguel Angel ARIAS, Defendant-Appellant.

No. 24829.

United States Court of Appeals, Ninth Circuit.

Jan. 12, 1972.

642

James L. Hay (argued), Long Beach, Cal., for defendant-appellant.

R. Michael Bruney, Asst. U. S. Atty. (argued), Harry D. Steward, U. S. Atty., Robert H. Filsinger, Asst. U. S. Atty. & Chief, Crim. Div., San Diego, Cal., for plaintiff-appellee.

Before KILKENNY and CHOY, Circuit Judges, and BYRNE *, District Judge.

WILLIAM M. BYRNE, District Judge:

On July 6, 1968, customs officials at the San Ysidro, California, Port of Entry, found sixty pounds of marihuana in a 1957 Buick driven across the border by Luz Villagran. Claiming, in effect, to be only a "mule", Villagran related to authorities that Miguel Arias, who had assertedly promised to pay her one hundred dollars to drive the load car, had arranged to pick up the contraband at her home in Los Angeles upon his return from Mexico. Having promised her cooperation, Villagran was escorted home by customs agents [1] and "told to proceed as she was supposed to," i. e., to await Arias' pickup. The expected rendezvous did not occur until the next morning when Arias arrived at Villagran's house driving his 1966 Chevrolet station wagon. He told Villagran that he wanted to unload the marihuana in her house, but when she told him her boy friend was in the house, the defendant said he had better take the load car.

Arias backed the Buick out of the driveway, proceeded for a short distance and then returned to Villagran's house [2] where he was placed under arrest by the customs agents. Although a cursory weapons search of Arias' station wagon yielded negative results, a more thorough probe, pursuant to 49 U.S.C. §§ 781 [3] and 782 [4], conducted at a federal

---

* Honorable William M. Byrne, Senior United States District Judge, Central District of California, sitting by designation.

1. Following Villagran's decision to cooperate with authorities, customs agents "replaced ten of the kilos (of marihuana) in the Buick." (RT)

2. One of the agents who had Villagran's house under surveillance "thought" that he and his cohorts had been detected by Arias as he began to proceed down the street, thus explaining the abrupt return to Villagran's driveway.

3. 49 U.S.C. § 781 provides, in pertinent part, as follows:
"(a) It shall be unlawful (1) to transport, carry, or convey any contraband article in, upon, or by means of any . . . vehicle . . . ; (2) to conceal or possess any contraband article in or upon any . . . vehicle, . . . or upon the person of anyone in or upon any . . . vehicle, . . . to facilitate the transportation, carriage, conveyance, concealment, receipt, possession, purchase, sale, barter, exchange, or giving away of any contraband article.
"(b) As used in this section, the term 'contraband article' means—
"(1) Any narcotic drug which has been or is possessed with intent to sell or offer for sale in violation of any laws or regulations of the United States dealing therewith; or which has been acquired or is possessed, sold, transferred, or offered for sale, in violation of any laws of the United States dealing therewith; . . . or which does not bear appropriate tax-paid internal-revenue stamps as required by law or regulations;"

4. U.S.C. § 782 provides, in pertinent part, as follows:
"Any . . . vehicle . . . which has been or is being used in vio-

facility on Terminal Island disclosed a quantity of red seconal capsules and "marihuana debris" lodged in the vehicle's left rear quarter panel. At a jury trial, Arias was found guilty of conspiring to smuggle marihuana and of smuggling marihuana, violations of 21 U.S.C. § 176a. We affirm.

Arias has set forth three assertions of error. In large part, Arias attributes his conviction to the introduction of tainted evidence. Specifically, he condemns the warrantless search of his automobile which led to the seizure of the seconal capsules and the "marihuana debris" encased in the inner paneling of the vehicle. According to Arias, the search was conducted without probable cause and that permitting the introduction of the discoveries resulting therefrom, clearly prejudiced his position before the jury.[5]

Arias argues that "the facts of this case clearly bring it within the ruling of Howard v. United States, 423 F.2d 1102 (9th Cir. 1970)," that the forfeiture provisions of 49 U.S.C. §§ 781 and 782 cannot vindicate a vehicular search where seizing officers are without "probable cause to believe that the [automobile] had been used to 'facilitate' the transportation of marihuana in the load car." 423 F.2d at 1103.

When Howard is read free of partisan self interest which might impair objective legal analysis, it becomes readily apparent that the Howard court was addressing itself to a factual situation far different from the one now in controversy. There, the load car, which carried a sequestered cargo of marihuana, had been placed under constant surveillance from the time it entered the United States from Mexico. After having crossed the border, the driver, a government informant, contacted his connection who instructed him where to park the car. Shortly thereafter, Howard arrived in the area, drove once around the block and then parked his automobile across the street from the load car. After driving the load car for approximately fourteen blocks, Howard was arrested and searched. A search of Howard's automobile at the parking lot of the Federal Building (the arresting officers had confiscated Howard's car keys) yielded a cache of heroin which became the subject of a second count.

As indicated from the record, the officers had instituted a search of Howard's automobile without any basis to believe that it "then contained, or ever contained, contraband." Indeed, the only knowledge the seizing officers had about this vehicle was that Howard had driven it to where the load car was parked. Under such circumstance, the search was deemed unlawful: "[T]he seized car was merely the means of locomotion by which the person suspected of participating in illegal drug traffic reached the site of that activity. . . . The use of an automobile to commute to the scene of a crime does not justify the seizure of that automobile under sections 781 and 782." 423 F.2d at 1103–1104.

In contrast to the situation in Howard, here the station wagon was used to facilitate the transportation of the contraband, and the customs agents knew that it was being used to facilitate the consummation of a crime. At the time of her arrest at the border, Villagran agreed to cooperate with the authorities. As part of this cooperation, Villagran related how she and Arias had driven to Tijuana in separate cars (she in the Buick, he in the Chevrolet station wagon) for the purpose of securing marihuana which would be clandestinely brought to the United States. Villagran told the agents that she had been instructed by Arias to drive directly to her house and wait for him to arrive with his station wagon. She related

lation of any provision of section 781 of this title, or in, upon, or by means of which any violation of said section has taken or is taking place, shall be seized and forfeited: *Provided* . . . ."

5. Arias maintained that his presence at Villagran's home was in response to her invitation to indulge in extramarital relations.

how Arias planned to use both cars in executing the "unloading" of the contraband. Lacking sufficient information "to find (Arias) . . . and a (particular) white station wagon" at the Port of Entry and hoping "to locate other co-conspirators in the violation," the customs agents instituted the surveillance procedure which culminated in the seizure of contraband secreted in Arias' automobile. In sum, because the seizing officers *did* have reasons to believe that the vehicle in question was more than a "means of locomotion by which the person suspected of participating in illegal drug traffic reached the site of that activity," we find the instant factual setting clearly distinguishable from the one in *Howard*. See, Lockett v. United States, 390 F.2d 168 (9th Cir. 1968), cert. denied, 393 U.S. 877, 89 S.Ct. 175, 21 L.Ed.2d 149 (1968); Burge v. United States, 342 F.2d 408 (9th Cir. 1965), cert. denied, 382 U.S. 829, 86 S.Ct. 63, 15 L.Ed.2d 72 (1965).

■ Arias contends that he was denied due process by the government's failure to introduce evidence under its control which corroborated his claim of innocence. Specifically, he maintains that a recording [6] of his telephone conversation with Villagran was withheld from the triers of fact because it confirmed his defense. In point of fact, Arias' own testimony undercuts his contention. According to his first hand account of this conversation, Villagran asked him whether he wanted "to come over to (her) house." Although he claims to have interpreted Villagran's query as an invitation to engage in an extra marital affair, thus explaining why he went to Villagran's house, Arias did not testify that such a proposition was even obliquely mentioned during the brief conversation. In short, this conversation, as related by ear witness Arias, dealt exclusively with his interest in coming to Villagran's home early in the morning. A recording to this effect would hardly have enhanced his position before the jury.

■ Finally, Arias raises for the first time the defense of entrapment, claiming that he was "baited (by) the government, through its agent Villagran . . . into a situation by its very nature tend(ed) to prove guilt of a criminal act." According to Arias, the enticing early morning telephone call which lured him to Villagran's home, succeeded in depicting purely innocent conduct as the last chapter of a criminal conspiracy. In short, Arias contends that he has been victimized by the government into appearing as if he were the connection coming to gather the illegal cargo.

Arias' belated assertion of entrapment is patently absurd. Based on his own account of Villagran's telephone call, he was merely asked whether he was coming to her house. Although he attempted to attribute his presence at Villagran's home to "wife cheating", his energies were in fact directed at activities which were entirely consistent with the "unloading" plan Villagran had outlined to authorities at the time of her arrest. In sum, this case is yet another example of officers providing a stage upon which one criminally predisposed might perform.

Affirmed.

---

6. Although there was no evidence that such a recording was made by the customs agents, Arias has inferred from the following statement made during argument by the government's attorney, that one is in existence: "The next morning she called, the call was listened to by the officer . . .". Listening to a conversation is entirely different from recording the conversation.