HAMITER, Justice.
Judith K. Roach (the defendant herein) and one Pairlee M. Serio were jointly charged in a bill of information with illegal possession of a narcotic drug. The latter pleaded guilty and is no longer involved in this proceeding.
Judith K. Roach pleaded innocent. She was then tried before a jury which returned a verdict of guilty. Thereafter, she was sentenced to serve five years in the state penitentiary.
She is appealing from the conviction and sentence.
Although numerous bills of exceptions (reserved during the proceedings in the district court) were perfected appellant relies on nine to obtain a reversal. (Only these are discussed in the brief and mentioned in oral argument here. We presume, therefore, that the others have been abandoned.)
The bills discussed overlap and present only three issues. These are set forth in the defendant’s brief (and in oral argument) as three “Assignments of Error”, with reference in each to the appropriate bills. They will be so treated in this opinion.
Assignment of error No. 1 involves bills of exceptions Nos. 1, 2, 11 and 12. These bills were reserved when the trial court overruled Roach’s and Serio’s pretrial motions to suppress certain evidence, hereinafter discussed, and to the court’s overruling of Roach’s objection to the introduction of that evidence during the course of the trial.
The evidence consisted of certain narcotic substances, and also paraphernalia said to be used in the administration of the drugs, found in the apartment of the defendant Roach located at 1014 Terpsichore Street in New Orleans. She urges, that the objects were obtained as a result of an illegal search of her apartment without a search warrant and were, therefore, not admissible in evidence against her. The state, on the other hand, contends that they were validly obtained as the result of *413 a search made as an incident to the arrest of one Cleon Mixon and that, therefore, the court’s rulings were correct.
Briefly, the evidence taken on the motion to suppress, as well as at the trial, reveals that the objects were obtained under the circumstances which we detail as follows. The search and seizure occurred on the afternoon of April 17, 1967. One of the officers who effected them, a Patrick Lampard, previously had received information through his superiors that there was an arrest warrant outstanding for Mixon for forging narcotic prescriptions in Baton Rouge, and that he frequented the apartment mentioned above on Terpsichore Street, receiving mail there. When this information was obtained is not definitely established by the record, but it appears to have been some time before the date in question because the officer testified that prior to April 17, 1967 he had kept a periodic surveillance of the house to see if Mixon was at the said address.
Although numerous prior trips to the house proved fruitless, in the afternoon of April 17, 1967 Lampard, in the company of Officers Clinton E. Lauman and Frederick A. Soule, went again to 1014 Terpsichore Street for the purpose of seeing if Mixon was there. At that time they observed Mixon’s car, occupied by his mother and her dog, parked outside the residence. Lampard testified that he knew Mixon and that “I knew the automobile; I know his mother; and I know how he operates. He doesn’t leave his mother too far from him. He doesn’t leave her for a second.”
Lauman was stationed outside at the rear door of the apartment while Lampard and Soule went to the front. Lampard testified that they knocked on the door; that it was opened by Pairlee M. Serio; that he identified himself; and that he was permitted by the Serio woman to enter the house. He asked her where Mixon was, and she said that she did not know any Cleon Mixon. At this time he saw Mixon sticking his head out of the kitchen door at the rear of the apartment. He said that when Mixon recognized him the former ducked back into the kitchen, and that then he and Soule ran in and arrested Mixon, searched his person, as well as the drawers of the kitchen and the rest of the house. On finding the articles above referred to in the kitchen’s sink drawer, as well as a metal bottle cap (which appeared to be burned) on top of the refrigerator, he also arrested the defendant and the Serio woman.
The state contends that under the decision of the United States Supreme Court in United States v. Rabinowitz, 339 U.S. 56, 70 S.Ct. 430, 94 L.Ed. 653, which has been subsequently overruled by Chimel v. California, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (decided June 23, 1969), *415 the search was legal; but that even under the Chimel decision the search was valid as being incident to' a lawful arrest, inasmuch as the officers had the right to search the arrestee’s person, as well as the area within his reach and control from which he might obtain weapons or evidence for the purpose of destroying it.
The United States Supreme Court has not yet rendered any definitive pronouncement as to whether it will apply the Chimel decision retroactively; and if so at what point of time — whether to the date of the search, the date of the trial, or to cases such as this one which are still under judicial consideration, although the trial here was held before the rendition of Chimel. In view of this we will not undertake to give the case any retroactive effect.
Nevertheless, a careful review and analysis of the evidence adduced in connection with the motion to suppress and during the trial leads us to conclude that the search was not proper even under the jurisprudence as it existed prior to Chimel. As will be hereinafter shown, we are of the opinion that it was an unreasonable and unwarranted intrusion into this defendant’s right to the security and privacy of her home guaranteed by the Fourth Amendment of the United States Constitution.
In arguing the issue presented, the state contends that when the officers entered the kitchen Mixon was standing in front of the kitchen drawer by the sink, consuming a chocolate drink “as if to wash something down”; and that, therefore, it was reasonable for them to assume that he might have secreted some of the fruits of his alleged crime, or a weapon, in the drawer. It further avers that “of course no search was necessary to discover the burned bottle cap which was in plain view on the tray on top of the refrigerator.” And it says that having found these items in the kitchen it was proper for them to arrest this defendant and to search her entire apartment in connection with her arrest.
As we appreciate the evidence, it simply does not bear out the state’s contention. It should be pointed out that the testimony referred to by the state with regard to Mixon’s position when the officers entered the kitchen is that of Officer Lampard. But this is in conflict with other parts of his testimony which supports the testimony of the defendant and Mixon that this defendant was in front of the sink when the officers entered and that Mixon was near the table. Thus, on the hearing of the motion to suppress Lampard specifically stated that when he entered the kitchen Mixon was “Right by this table going towards the door.” Later he stated that “As soon as we got into the kitchen she was sitting with her back to the wall here * * *. She was facing toward the cabinet where Soule had first gotten her. When she was over at this cabinet. That *417 is why he got her away from there.” (Italics ours.)
During the trial Lampard again testified on cross examination as follows:
"Q. After you arrested Cleon Mixon, what caused you to search the rest of the house?
A. Freddie (Soule) finding this narcotics paraphernalia right where this girl was.
Q. Wasn’t that a product of the search ?
A. Wasn’t that what?
Q. Wasn’t that a product of the search ?
A. It was immediate to our going in there; he walked to where she was and he found this narcotics, and they were advised that they were under arrest for possession of narcotics.” (Italics ours.)
A portion of Officer Lauman’s testimony was as follows:
“Q. What was your reason for searching?
A. All subjects’ arms were examined.
Q. Their arms were examined?
A. They were all dope fiends. Mix-on was wanted and I felt like we were obligated to search; not only had the right but obligated.”
It is true that Soule, on the trial, also stated that he first saw Mixon standing near the sink in the kitchen; and that he searched where Mixon was standing. But we find it interesting and important that he was not even called to testify on the pretrial hearing to support such a vital factual issue.
Nor does the evidence support the assertion that the “burned bottle cap” (said to be used as a “cooker” by narcotic addicts) was in “plain view”. Officer Lauman, who found it, did not testify unequivocally that it was burned. Rather, he said that “to the best of his knowledge” it was burned and that he was sure it was because he would not have taken it if it had not been. Moreover, he said that he did not know it was in the bowl on the refrigerator until he started looking. He further testified that he did not remember whether it was in plain sight or whether he had to get up on “tip-toes” to look for it. Upon being asked whether it was readily available to be seen when he first went in, the court stated that he did not have to answer the question because he had already stated that he did not remember. Lauman also testified that he had been let into the apartment by the back door from his station outside; that when he came in Mixon was nearer the ice box than the sink drawer; and that he was in the apartment “some minutes” before the searching began.
*419 As we read the testimony in its entirety we cannot but conclude that the arrest of Mixon was made in such a manner as to effect entry into this defendant’s home for the purpose of searching it, because the officers suspected the presence of narcotics therein but that they had insufficient reliable information to obtain a search warrant.
The officers testified that they had such suspicions but no specific information. Likewise, they said they had no reason to believe that Mixon, on April 17, 1967, was still in possession of any fruits of the alleged crime with which he was charged, that act having been committed sometime prior to the date of the arrest. (The date of the act appears to have been April 3.)
And at one point, when Lampard was asked why he did not wait to arrest Mixon when he came out of the house, he replied : “Because we wanted to go into this house. From past experience we know that there was narcotics activity in and out of this house.”
Further tending to disprove the state’s contention that the officers were searching the drawer under the control of Mixon for weapons or fruits of this alleged crime is the fact that when they found the narcotics and paraphernalia they arrested for possession not only Mixon but also the occupants of the apartment.
Also fortifying our conclusion that the arrest was made for the purpose of gaining entry to the apartment is the fact that the state does not in any way show why, between the day they were notified of the warrant issued in Baton Rouge and the date of the arrest, they did not make an attempt to arrest him at his own home or that of his mother. One of the officers stated that he knew where Mixon lived; and the record abundantly establishes that he was constantly with his mother.
We are of the opinion, therefore, that the warrantless search of this defendant’s apartment was unreasonable; and it was one falling squarely within the prohibition of Go-Bart Importing Company v. United States, 282 U.S. 344, 51 S.Ct. 153, 75 L.Ed 374 and United States v. Lefkowitz, 285 U.S. 452, 52 S.Ct. 420, 76 L.Ed. 877.
In Go-Bart Importing Company government officials with sufficient information to justify the arrest of the accused without a warrant went to their place of business to arrest them for conspiring to commit a nuisance by unlawfully possessing, transporting, selling, etc., intoxicating liquor. (Actually, they had an arrest warrant, but the court found it invalid; however, it was held the arrest itself nevertheless was valid because of the information that the crime was being then committed.) Following the arrests they searched the persons of the accuseds, their desks and safe, and seized papers, account books, etc. pertaining to their dealings. The court pointed out that the officers had had ample *421 time to have obtained a search warrant, and that the general searching and rummaging in the place without a warrant constituted an unreasonable search and seizure despite the contemporaneous arrest.
The court reinforced its decision in Lefkowitz, supra. There the government official obtained an arrest warrant on information that the defendant and other persons conspired to sell, possess, etc. intoxicating liquors, and that part of the conspiracy was effected from Room 604 of a given address. The officers went to the stated place, arrested the accused, searched his person, desks, and cabinets and seized papers, books and other .articles, all without a search warrant. The United States Supreme Court approved a district court ruling that had suppressed the evidence. The government there argued that since the arrests were lawful, the search of the place (in the possession and under the control of the accuseds) where they were made was also lawful. The court dismissed the argument saying: “The only question presented is whether the searches of the desks, cabinet, and baskets and the seizures of the things taken from them were reasonable as an incident of the arrests. And that must be decided on the basis of valid arrests under the warrant. Save as given by that warrant and as lawfully incident to its execution, the officers had no authority over respondents or anything in the room. The disclosed circumstances clearly show that the prohibition agents assumed the right contemporaneously with the arrest to search out and scrutinize everything in the room in order to ascertain whether the books, papers or other things contained or constituted evidence of respondents’ guilt of crime, whether that specified in the warrant or some other offense against the Act. Their conduct was unrestrained. * * *
<< % ‡ ifc
“Here, the searches were exploratory and general and made solely to find evidence of respondents’ guilt of the alleged conspiracy or some other crime. * * *
“This case does not differ materially from the Go-Bart Case and is ruled by it. An arrest may not be used as a pretext to search for evidence. * * * ” (Italics ours.)
We do not believe that later the court in the Rabinowitz case, supra (relied on here by the state), intended to override Go-Bart Importing Company and Lefkowitz. Rather, as will be shown, it distinguished them on the facts.
In Rabinowitz the government officials had received reliable information that the accused had obtained from the informer a large number of stamps bearing forged overprints. Thereafter a special agent went to the retail stamp store of the accused and purchased four stamps found to bear such forgeries; and on this evidence, as well as *423 on the knowledge that previously the accused had pleaded guilty to a charge of illegally overprinting postage stamps, the agents obtained a warrant for his arrest. On the basis of the warrant they went to the accused’s retail store, a one-room office open to the public, and arrested him. At the same time they searched a desk, safe and file cabinet and found a large number of stamps on which it was later determined that forgeries had been made. He was charged with selling four forged and altered stamps and in a second count with possession of forged and altered stamps. The United States Supreme Court held that the search and seizure was valid under the particular circumstances existing there. The court posed the particular question thusly: “ * * * Even if the warrant of arrest were not sufficient to authorize the arrest for possession of the stamps, the arrest therefor was valid because the officers had probable cause to believe that a felony was being committed in their very presence. * * *
“The arrest was therefore valid in any event, and respondent’s person could be lawfully searched. Could the officers search his desk, safe and file cabinets, all within plain sight of the parties, and all located under respondent’s immediate control in his one-room office open to the public?” (Italics ours.)
In ruling as it did the court observed: “The right 'to search the place where the arrest is made in order to find and seize things connected with the crime as its fruits or as the means by which it was committed’ seems to have stemmed not only from the acknowledged authority to search the person, but also from the long-standing practice of searching for other proofs of guilt within the control of the accused found upon arrest. Weeks v. United States, 232 U.S. 383, 392, 34 S.Ct. 341, 344, 58 L. Ed. 652, 655, L.R.A. 1915B, 834, Ann.Cas. 1915C, 1177. It became accepted that the premises where the arrest was made, which premises were under the control of the person arrested and where the crime was being committed, were subject to search without a search warrant. Such a search was not ‘unreasonable’ * * *
“ * * *
“What is a reasonable search is not to be determined by any fixed formula. The Constitution does not define what are ‘unreasonable’ searches and, regrettably, in our discipline we have no ready litmus-paper test. The recurring questions of the reasonableness of searches must find resolution in the facts and circumstances of each case. Go-Bart Importing Co. v. United States, 282 U.S. 344, 357, 51 S.Ct. 153, 75 L.Ed. 374. * * * ” (Italics ours.)
In distinguishing Go-Bart Importing Company and Lefkowitz the court said: “ * * * Those cases condemned general exploratory searches, which cannot be undertaken by officers with or without a *425 warrant. In the instant case the search was not general or exploratory for whatever might be turned up. Specificity was the mark of the search and seizure here. There was probable caztse to believe that respondent was conducting his business illegally. The search was for stamps overprinted illegally, which were thought upon the most, reliable information to be in the possession of and concealed by respondent in the very room where he was arrested, over which, room he had immediate control and in which he had been selling such stamps unlawfully. * * * (Italics ours.)
The court in Rabinowitz set up the five particular conditions existing there (on which it based its conclusion) that the search was reasonable, as follows: “ * * (1) the search and seizure were incident to a valid arrest; (2) the place of the search was a business room to zvhich the public, including the officers, was invited; (3) the room was small and under the immediate and complete control of respondent; (4) the search did not extend beyond the room used for unlazvful purposes; (5) the possession of the forged and altered stamps was a crime, * * (Italics ours.)
The differences between the circumstances existing in that case and the instant one are so immediately obvious that it would serve no useful purpose to detail them. Suffice it to mention one important difference between this case and all of the others cited — the arrestee here (Cleon Mixon) was not even the person who had control and charge of the apartment. We do not believe that the ¿rrest of a person, under the circumstances here, should be used as the excuse for a general search and rummaging throughout the home of a third party merely because he happens to be arrested there. We think that the search was illegal, a violation of defendant’s constitutional rights; and that the fruits thereof should have been suppressed and were improperly admitted into evidence.
Although the error in the court’s rulings on which the above discussed bills were based will require the granting of a new trial we, nevertheless, will review the issues presented in the other two assignments inasmuch as the errors complained of therein will probably be raised on a new trial.
Assignment of error No. 2 encompasses bills of exceptions Nos. 6, 7, 21 and 22. These bills were reserved to the court’s failing to suppress, and permitting to be introduced into evidence, certain inculpatory statements made by the defendant to the arresting officers.
We have read the evidence taken in connection with these bills and find that they amply sustain the trial court’s conclusion that prior to the introduction of the statements the state had laid the foundation to show that they were freely and voluntarily given and that the defendant had *427 been advised of her constitutional rights in accordance with the rules set forth in Escobedo v. Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 and Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed. 2d 694. In fact, the accused herself acknowledged that she had been informed as to her right to counsel; and during the laying of the predicate it appeared that the primary aim of the defense was to show that she had made no statements — not that she had not been fully advised of her rights. The question of whether she did, in fact, make them is one for the jury.
In assignment of error No. 3 the defendant urges that it was error for the court to permit testimony of the arresting officers concerning the “conduct” of Pair-lee Serio when they entered the defendant’s apartment. Defendant contends that “Conduct, as well as speech of a third person not called as a witness, under oath, and subject to cross examination should be excluded as hearsay.”
We find no authority for the proposition put forth. When a witness describes what a person did (not what he said) that is evidence of what the witness saw and is clearly not hearsay. There is no merit in the bill.
(We note, incidentally, that the defendant in the brief indicates that the third assignment encompasses bills of exceptions Nos. 9 and 10. However, our examination of the bills themselves reveals that it pertains only to the ruling made in connection with bill of exceptions No. 10. Bill of exceptions No. 9 was reserved to an entirely different and unrelated ruling which occurred during the state’s opening statement. The issue presented therein was not briefed or argued and is presumed to have been abandoned.)
For the reasons assigned bills of exceptions Nos. 1, 2, 11 and 12 are sustained and the conviction and sentence are annulled and set aside. The case is remanded for a new trial consistent with the views herein expressed.
SUMMERS, J., dissents.